## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JAMES CHAVEZ,**

        **Plaintiff,**

**v.**                                                                 **No. CV 10-0205 JCH/ACT**

**JOHN STOMP, Individually and
in his Official Capacity as an employee
and supervisor of Albuquerque Bernalillo
County Water Utility Authority, and the
ALBUQUERQUE BERNALILLO COUNTY
WATER UTILITY AUTHORITY,**

        **Defendants.**

## MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE TO ALTER OR AMEND JUDGMENT

COMES NOW Defendant John Stomp, by and through his attorneys, Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A., and pursuant to Federal Rules of Civil Procedure 50 and 59 moves for judgment as a matter of law, or in the alternative, to alter or amend the judgment.  As grounds for this motion, Mr. Stomp states:

### I.      INTRODUCTION

Plaintiff asserted in this action that the Water Authority and Mr. Stomp discriminated against him on the basis of race and religion.  He brought claims for racial and religious discrimination against the Water Authority under Title VII of the Civil Rights Act of 1964, and a claim for retaliation on the basis of religion under 42 U.S.C. § 1983 against Mr. Stomp.  All of Plaintiff's claims were based on his contention that he did not receive certain promotions for which he applied within the Water Authority.

The jury returned a verdict in favor of the Water Authority on Plaintiff's Title VII claims, concluding that Plaintiff did not prove that he was not selected for a promotion due to his race,

and further, did not prove that he was not selected for a promotion due to his religious beliefs. The jury concluded, however, that Mr. Stomp violated § 1983, finding that Plaintiff proved "defendant Stomp retaliated against him for exercise of his First Amendment rights by preventing his promotion."   The jury then awarded $180,000 in compensatory damages, and $100,000 in punitive damages.

As discussed more thoroughly below, there was not sufficient evidence of retaliation in violation of § 1983 to submit the § 1983 claim to the jury.  Given this lack of evidence, the Court should grant judgment as a matter of law in favor of Mr. Stomp on Mr. Chavez's § 1983 claim. Moreover, the jury's anomalous finding on the § 1983 claim cannot be reconciled with the jury's finding that Mr. Chavez did not prove that he was not selected for a promotion due to his religious beliefs.  The jury's award of compensatory damages against Mr. Stomp must therefore be set aside.  Should the Court conclude otherwise, however, remittitur is necessary to correct the excessive compensatory damages awarded to Plaintiff.  Even the highest figures provided by Plaintiff concerning his claimed damages do not support the $180,000 compensatory damages award, and Mr. Chavez's own testimony reflects that he should not in any event have been selected for the promotions at issue because he lacked the minimum supervisory experience to qualify for those positions.

The punitive damages award similarly cannot stand.  Plaintiff did not request punitive damages in his §1983 complaint, and regardless, there was no evidence capable of supporting an award of punitive damages.  Furthermore, even if the Court concludes the evidence could support an award of punitive damages, remittitur is necessary to correct the jury's excessive punitive-damages award, which clearly resulted from passion or prejudice on the part of the jury.

Therefore, Defendant Stomp respectfully requests that the Court enter judgment as a matter of law in favor of Mr. Stomp on Plaintiff's § 1983 claim, or alternatively, on Plaintiff's claim for punitive damages.  Should the Court decline to enter judgment as a matter of law, Defendant Stomp requests that the Court employ remittitur to reduce both the compensatory and punitive damages awards.

## II.     MR. STOMP WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S § 1983 CLAIM,

The evidence presented by Mr. Chavez was not sufficient to present a legally sufficient evidentiary basis for the jury to find a violation of §1983.  The Court should therefore have granted judgment as a matter of law on Mr. Chavez's § 1983 claim.

Rule 50(a) allows the Court to resolve an issue against a party when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue," and to "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 50(a).  Judgment as a matter of law is appropriate "when the evidence is so patently in favor of the moving party that a jury verdict in favor of the party opposing the motion would be improper."  *Campbell v. Bartlett*, 975 F.2d 1569, 1582 (10th Cir. 1992) (internal quotation marks omitted).  When considering a renewed motion for judgment as a matter of law, "the court must view all of the evidence in the light most favorable to the nonmoving party, and then determine whether there is evidence upon which the jury could have properly relied in returning a verdict for the nonmoving party."  *Klein v. Grynburg*, 44 F,3d 1497, 1503 (10th Cir. 1995).

Viewing the evidence presented in the light most favorable to Mr. Chavez, it is clear that insufficient evidence was presented to support a finding of retaliation under § 1983.   To prevail

on his retaliation claim, Mr. Chavez was required to establish that he was engaged in constitutionally protected activity and that Mr. Stomp took action against Mr. Chavez motivated by Mr. Chavez's exercise of his First Amendment rights. *Cf. Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007) ("To establish a § 1983 retaliation claim against non-immune officials, Becker must plead and prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights."); *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1234 (10th Cir. 2000); *see also* Substantive Charge, Doc. No. 86, at 3 ("In order to establish, by a preponderance of the evidence, that defendant Stomp violated his First Amendment rights by retaliating against him, he must prove that the free exercise of his religion was a substantial or motivating factor in defendant Stomp's decision to retaliate against him.").

However, as the Water Authority argued at the close of Mr. Chavez's case, all of the evidence presented by Mr. Chavez concerning Mr. Stomp's alleged "religious advances" or proselytization occurred in 2003—long before the decisions at issue in this case. *See* Tr. at 345, 34-37, 264-267, 353-356; *see also* Tr. at 332-339. Retaliation requires a casual connection between the events prompting the retaliation and the alleged retaliation. *See Becker*, 494 F.3d at 905; *Kendrick*, 220 F.3d at 1234. Mr. Chavez applied for the promotions at issue during the period of 2006-2008. The gap in time between 2003 and 2006-2008 was too significant to infer that any action taken by Mr. Stomp with respect to the promotions was retaliation for Mr. Chavez's resistance or lack of response to his "religious advances." *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[R]etaliatory motive may be inferred when

an adverse action closely follows protected activity. However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.") (internal citation omitted); *Annett v. University of Kansas*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (plaintiff must "proffer[] evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action") (internal quotation marks omitted).  In fact, even a much smaller temporal connection has been held insufficient to establish retaliatory motive.  *See Anderson*, 181 F.3d at 1179 ("[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation.  By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation.") (internal citation omitted).

Moreover, no evidence was presented indicating that Mr. Stomp considered Mr. Chavez's response to the "religious advances" when making promotion decisions, or advocated against the selection of Mr. Chavez for the promotions at issue.  Mr. Chavez had in fact not given Mr. Stomp any reason to believe the "religious advances" were not well-received.  *See* Tr.[1] at 359 (Mr. Chavez informed Mr. Stomp that he was reading a bible, and was going to church).  Mr. Chavez consequently did not take any action that could have prompted Mr. Stomp to retaliate. *See Jones v.* UPS, 502 F.3d 1176, 1195 (10th Cir. 2007) ("Mr. Jones cannot establish a causal link between his allegedly protected activity and UPS's refusal to return him to work unless he can show that UPS knew he was engaging in protected activity."); *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1267 (10th Cir. 2009) ("plaintiff must also demonstrate that the individual who engaged in a materially adverse action knew about the protected activity")

---

[1] The transcript of the first two days of trial (August 20-21) is consecutively numbered, and will be cited as Tr.  The transcripts for the following two days will be cited as the 8/22/12 Tr. and 8/23/12 Tr.

(emphasis omitted); *Gruppo v. FedEx Freight Sys.*, 296 Fed. Appx. 660, 663-64 (10th Cir. 2008) (Affirming district court's decision to grant judgment as a matter of law under Rule 50 because "there [wa]s no evidence to establish that management ever understood that Mr. Gruppo was trying to communicate, if he was, about a potential violation of the FMLA. . . . [T]here was no evidence that Mr. Gruppo informed defendants that he thought what they were proposing to do to  the employee was illegal because it was contrary to the FMLA, or even more generally, because it interfered with the employee's right to take specific amounts of unpaid medical leave without suffering adverse employment consequences.").

   Adding to the absence of a connection between Mr. Stomp's alleged conduct and the promotion decisions at issue is the fact that all promotion decisions were made collectively by a number of interview panelists.  Tr. at 345-56 (moving for directed verdict on this basis); Tr. at 407-408 (Mr. Stomp) (no interview panelist has veto power, there is a discussion between panel members regarding the selection, and no panelists' opinions are given greater weight than the others'); Tr. at 310-11 (David Montgomery) (each panelist scores candidate, and then there is a discussion between the panelists to finally pick the candidate).   Mr. Chavez presented no evidence that Mr. Stomp exercised any undue influence on the interview panels, or even advocated against Mr. Chavez obtaining the positions.  In fact, Mr. Chavez did not call as witnesses any of the individuals who sat on interview panels with Mr. Stomp.

   There was, quite simply, no evidence presented even implying that Mr. Stomp retaliated against Mr. Chavez.  Instead, Mr. Chavez's claims of retaliation rested entirely on an assumption that Mr. Stomp's mere presence on interview panels years after the alleged "religious advances" occurred, in combination with the selection of other candidates, amounted to retaliation in violation of § 1983.  A constitutional violation cannot be based on such a strained inference.

Because no evidence was presented suggesting that Mr. Stomp took any retaliatory action based on religion years after the discussions between Mr. Stomp and Mr. Chavez concerning religion, Mr. Stomp was entitled to judgment as a matter of law on Mr. Chavez's § 1983 claim.  The Court should accordingly vacate the jury's award, and enter judgment as a matter of law in favor of Mr. Stomp.  *See* Fed. R. Civ. P. 50(b).

### III.    REMITTITUR IS NECESSARY BECAUSE THE JURY AWARDED DAMAGES IN EXCESS OF THE MAXIMUM AMOUNT THE EVIDENCE PRESENTED WOULD SUPPORT.

In the event the Court declines to grant judgment as a matter of law in favor of Mr. Stomp, the Court should exercise its discretion to order a remittitur.  "When a court concludes that there was error only in the excessive damage award, but no error tainting the finding of liability, it may order a remittitur or grant a new trial if the plaintiff refuses to accept the remittitur."  *Klein v. Grynburg*, 44 F,3d 1497, 1504 (10th Cir. 1995).  Remittitur is appropriate when the award of damages is clearly against the weight of the evidence and raises an inference that it was based on passion or prejudice.  *See Blank v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998); *Klein v. Grynburg*, 44 F,3d 1497, 1504 (10th Cir. 1995).

"[A] remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence."  *K-B Trucking Co. v. World Leasing, Inc.*, 763 F.2d 1148, 1163 (10th Cir. 1985).  "There are three general approaches for determining the proper amount of a remittitur. First, the excessive verdict may be reduced to the minimum amount that the jury could have awarded. Second, the excessive verdict may be reduced to the maximum amount that the jury could have awarded. Third, the excessive verdict may be reduced to whatever amount the reviewing court thinks that the jury

should have allowed." *K-B Trucking Co. v. World Leasing, Inc.*, 763 F.2d 1148, 1162 n.21 (10th Cir. 1985).

### A.  Mr. Chavez Presented Little Evidence Concerning Damages.

Mr. Chavez was required to prove his alleged lost earnings with specificity. *Williams v. Missouri Pacific R.R.*, 11 F.3d 132, 135 (10th Cir. 1993) ("medical expenses and loss of earnings must be proved by evidence demonstrating the reasonable value of those losses"); *see also Blank v. Alexander*, 152 F.3d 1224, 1236, 1237 (10th Cir. 1998).  Yet, remarkably, Plaintiff merely presented evidence at trial cataloging the positions for which he applied—without ever attempting to tie his claims to a specific promotion he claims he should have obtained.

The following is a description of the evidence presented concerning Mr. Chavez's promotions:

- Mr. Chavez applied for his first promotion while still employed by the City of Albuquerque on December 21, 2005.  Tr. at 51.  The promotion was a principal-engineer position.  *Id.*  Mr. Chavez was invited to interview, but was not selected.  *Id.* at 51, 75-76. Mr. Chavez did not present any documentation of the salary range for the position.

- Mr. Chavez applied for a second principal-engineer position while employed by the City of Albuquerque on August 25, 2006.  Tr. at 52.  Mr. Chavez interviewed for the position, but was not selected.  *Id.* at 53-54, 76.  Mr. Chavez did not present any documentation of the salary range for the position.

- Mr. Chavez applied for a chief-engineer position on August 25, 2006, while still employed by the City of Albuquerque, but was not selected.  *Id.* at 54.

- Mr. Chavez then applied for a chief-engineer position on October 26, 2006.  Tr. at 55.
  Mr. Chavez admitted that the individual selected for the promotion was more qualified
  for the position than he was.  Tr. at 56, 93.

- Mr. Chavez subsequently applied for a principal-engineer position in May, 2007.  *See* Tr.
  at 56.  That position was not filled.  *See id.* at 60.

- Mr. Chavez applied for a principal-engineer position on June 6, 2007.  Tr. at 56.  Mr.
  Chavez interviewed for the position, but was not selected.  *See* Exhibit E[2].  The
  advertised salary range for the position was $2,056 to $2,499.20.  *See* Exhibit SS;
  Advertisement No. 7675.

- Mr. Chavez applied for a chief-engineer position on September 14, 2007, but was not
  selected.  Tr. at 59.

- Mr. Chavez applied for a chief-engineer position on September 27, 2007.  Tr. at 60.  That
  position was not filled.  *See id.* at 60.

- Mr. Chavez applied for a program-manager position on October 1, 2007.  Tr. at 60.  Mr.
  Chavez interviewed for the position, but David Price was selected.  *See id.* at 60, 76.  The
  advertised salary range for the position was $2,128.00 to $3,467.20 bi-weekly.  *See*
  Exhibit SS, Advertisement No. 8062.

- Mr. Chavez applied to be an environmental compliance manager on November 7, 2007.
  Tr. at 61.  Mr. Chavez did not interview for the position, and the Water Authority's
  Executive Director decided who would obtain the position.  *See* Exhibit T; Exhibit U.

- Mr. Chavez applied for chief-engineer positions on November 27, 2007, December 7,
  2007, and February 4, 2008, but those positions were not filled.  Tr. at 61, 63-64, 76.

---

[2] The trial exhibits cited in this motion are attached hereto as Exhibit A.

- Mr. Chavez applied for a program-manager position on May 27, 2008, but was not selected.  Tr. at 64-65.  Although Mr. Chavez interviewed for the position, Mr. Stomp did not sit on the interview panel.  *Id.* at 183.

- Mr. Chavez again applied for a promotion on July 14, 2008.  Tr. at 65.  The advertisement was issued for three chief-engineer positions.  *See id.*  One of the positions was one for which Mr. Chavez had previously applied, but which had not been filled.  *See id.* at 66.  Although Mr. Chavez was interviewed, he was not selected.  *See id.* at 67; Exhibit EE.  The advertised salary range for the positions was $2,449.60-$2,976.00, biweekly.  *See* Exhibit SS, Advertisement No. 9006.

- Mr. Chavez applied for a program-manager position on September 29, 2008.  Tr. at 68.  Mr. Chavez was invited to interview for the position, but declined to do so.  *See id.*

This was the evidence the jury had to consider when evaluating whether Mr. Chavez should be compensated for not being selected for one or more of these positions.  Mr. Chavez never explained his theory of damages, or made any effort to specifically connect his alleged damages to decisions concerning any of the promotions at issue.  Indeed, the Court observed that the evidence presented at trial did not lend itself to coherent damages calculation.  *See* 8/22/12 Tr. at 7-8 ("[A]t this point I don't really know how we're to charge damages. . . .  He made so many promotion applications, that I don't know what the jury is supposed to consider. . . .  I don't know what they're supposed to consider when they get to damages if they find liability . . . ."); *see also id.* at 27 ("I don't know how the jury is supposed to approach damages."); *id.* at 28 ("We're going to have a tremendous problem here when we get to damages.").

Although the Court suggested that a cogent theory could perhaps be articulated during closing argument, Plaintiff's closing argument did not explain the basis for his calculation of

damages.  During closing argument, counsel for Mr. Chavez argued that the Water Authority

cost him $15,000 - $20,000 per year during the period of 2006 to "at least" 2009.  8/22/12 Tr. at

68-69.  Counsel did not make any effort to tie these estimations to the limited evidence presented

concerning damages.   Furthermore, while argument could not in any event fill in the gaps in the

evidence presented concerning damages, Mr. Stomp observes that, even using counsel's high

number for the entire period between 2006 and 2009, or the date of trial, does not result in a

calculation of $180,000.

### B.  The Evidence Presented Does Not Support The Award Of Compensatory Damages.

An attempt to calculate damages based on the evidence presented at trial concerning possible

damages results in the conclusion that the jury could not reasonably have calculated $180,000.

Although Mr. Chavez applied for multiple positions over the years, it is clear that the only

relevant positions are those for which he was interviewed by Mr. Stomp, but was not selected.

*See* 8/22/12 Tr. at 29 (the Court) ("[W]ouldn't the jury have to . . . be satisfied that the plaintiff

had proved that Stomp was the person who did not select him for promotion?  Of course, that's

the only way you can get a retaliation claim proved against the individual Stomp."). As the above

list of positions for which Mr. Chavez applied reveals, this leaves Mr. Chavez with, at most, 5

positions:  December 21, 2005, August 25, 2006, and June 6, 2007 principal-engineer positions;

October 1, 2007 program-manager position; and July 14, 2008 program-manager position.

The 2005 and 2006 applications were made to the City of Albuquerque, making their

relevance questionable at best, and leaving the jury with no evidence regarding what Mr. Chavez

would have earned in those positions (the only evidence presented concerning actual salary

ranges were in advertisements issued by the Water Authority).   But in any event, using the only

principal-engineer salary range presented at trial (from 2007), and assuming Mr. Chavez would

have obtained the very first position for which he applied in December, 2005, the possible damages Mr. Chavez could have sustained are far less than $180,000.

Mr. Chavez testified that his current salary is $74,500 per year, following a significant raise of about 25% as a result of the Water Authority's comprehensive compensation study in September 2010. Tr. at 87-88. Thus, by Mr. Chavez's estimation, he would have been making about $59,600 prior to September 2010, and $74,500 after that. *Id.* Mr. Chavez did not provide any information concerning his salary during any other time period.

The only concrete evidence presented by Mr. Chavez concerning the salary of principal engineer was a salary range in 2007 between $2,056-2,499 biweekly—or $53,456-$64,974 annually, Tr. at 139. If the jury accepted that Mr. Chavez should have received the first principal engineer position for which he applied in December, 2005, and then used the 2007 principal-engineer high-end salary, it could conclude that he would have earned about $64,974 annually beginning in 2006, when by Mr. Chavez's estimation, he only made about $59,600 annually. Beginning in September 2010, however, Mr. Chavez was earning more than the $64,974 maximum salary.[3] Thus, the ultimate calculation of damages based on the theory that Mr. Chavez would have obtained the first promotion for which he applied would yield about $25,527 ($5,374 for 4.75 years).

This same analysis would result in an even lower number if the jury had applied it to the August 25, 2006 principal engineer position ($5,374 for about 4 years--$21,496). And when the high-end salary range is analyzed based on the assumption that Mr. Chavez would have received

---

[3] The Water Authority's comprehensive compensation study did not result in a set percentage increase for all positions, but rather, involved an individual evaluation of each position. It therefore cannot be assumed that salaries for all positions increased consistently with Mr. Chavez's increase, and no evidence was presented regarding the salaries of principal engineers, chief engineers, or program managers after September, 2010.

the position to which the range actually applied—the June, 2007 principal-engineer position—the possible damages are only about $17,466 ($5,374 for 3.25 years).

While damages do not need to be calculated with absolute precision, there is a huge jump from less than $30,000 to $180,000.  And Mr. Chavez provided no evidence to the jury concerning, for example, interest rates, or converting amounts to present value.

A higher number could be calculated assuming the jury concluded that Mr. Chavez should have been awarded the program-manager position for which he applied on October 1, 2007. That position had an advertised salary range of $2,128.00 to $3,467.20 bi-weekly ($55,328-90,147, annually).  Using the high number, and assuming Mr. Chavez earned $59,600 prior to September, 2010, and $74,500 after September, 2010, the high-end damages calculation would be:  $89,096 ($30,547 for 2 years and 11 months) + $31,294 ($15,647 for 2 years), a total of about $120,390.  This significantly higher number does not, however, support the jury's award of $180,000.  Plaintiff in effect admitted in closing argument that he should not have received the October 1, 2007 program-manager position in light of the qualifications of the selected applicant, David Price.  *See* 8/22/12 Tr. at 58 (Mr. Juarez) ("[W]hat's amazing in all of these jobs, they only show you one resume, and man, that is one heck of a resume.  And I admit to you it's one heck of a resume.  And everyone admits to you it's one heck of a resume.").  Furthermore, even counsel for Plaintiff did not suggest to the jury a figure of higher than $20,000 per year—making it highly unlikely that the jury would have considered the $30,000 difference included in this calculation.  And there was in any event no evidence on which the jury could have relied to fill the gap between $120,000 and $180,000.  Again, Plaintiff presented no evidence concerning, for example, interest rates, or the present value of amounts he could have earned in the past.

13

Finally, the jury's $180,000 award is also not justified based on the assumption that the jury concluded Mr. Chavez should have received the July 14, 2008 program-manager position. The advertised salary range for the positions was $2,449.60-$2,976.00, biweekly ($63,689.60-$77,376 annually). *See* Exhibit SS, Advertisement No. 9006. Thus, again assuming that Mr. Chavez earned $59,600 prior to September, 2010, and $74,500 after September, 2010, and using the high number included in the advertisement the calculation would be: $38,515 ($17,776 for 2 years, 2 months) + $5,752 ($2,876 for 2 years), a total of $44,267.

In sum, the absolute highest damage calculation that can be made from the evidence presented by Plaintiff amounts to $120,000. That calculation is, however, dependent on using the highest advertised salary range for one of the positions for which Mr. Chavez was interviewed but not selected, assumes that Mr. Chavez would have received the promotion he all but admitted he was not entitled to receive, and assumes that the jury would have independently applied a higher annual damages calculation than the one advocated by Plaintiff during closing argument. Thus, even the $120,000 figure—while significantly less than the amount actually awarded by the jury—is not reasonable. While one cannot be certain how the jury arrived at its high damages calculation, it is readily apparent that the jury's number cannot be based on a determination that Mr. Chavez should have obtained one of the positions for which he applied.

A remittitur is therefore necessary to correct the damages award. In fixing the amount of appropriate damages, the Court should reduce the award to the amount it believes the jury should have allowed. *See K-B Trucking*, 763 F.2d at 1162 n.21.

Because the first two positions for which Mr. Chavez applied took place while he was employed by the City of Albuquerque, and were not the focus of trial, the Water Authority submits that the most reasonable reduction would be based on the assumption that Mr. Chavez

14

should have obtained the 2008 program-manager position.  The Court should therefore fix damages within the advertised salary range for that position.  As discussed above, the high range for that position results in a possible damages calculation of $44,267.  The lower number advertized results in a calculation of:  $8,862 ($4,090 for 2 years, 2 months).   The Water Authority accordingly asks the Court to exercise its discretion to order a remittitur, reducing the compensatory damages to a number within the range of $8,862-$44,267.

## IV.   REMITTITUR IS NECESSARY BECAUSE THE AWARD OF COMPENSATORY DAMAGES DOES NOT COMPORT WITH THE JURY'S FINDINGS.

In the alternative, the Court should entirely set aside the entire compensatory-damages award as inconsistent with the jury's findings.  As discussed above, the $180,000 compensatory-damage award does not comport with the limited evidence presented by Mr. Chavez concerning damages.  That could only be because the jury did not come up with its award by determining what Mr. Chavez had proved he would have earned if he had been promoted.

In fact, the special verdict form reveals that the jury awarded compensatory damages after concluding that the Mr. Chavez had not proved that he was not selected for a promotion due to his religious beliefs.  The jury expressly found, when considering the religious-discrimination claim against the Water Authority, that Plaintiff did not "prove, by a preponderance of the evidence, that he was not selected for a promotion due to his religious beliefs."  Special Verdict Form, Doc. No. 90, Interrogatory No. 3.  Yet, the jury went on to conclude that Mr. Chavez did "prove, by a preponderance of the evidence that defendant Stomp retaliated against him for exercise of his First Amendment rights by preventing his promotion."  *Id.*  Interrogatory No. 5.

The jury's indications on the special verdict form that the Water Authority did not fail to promote Mr. Chavez based on religion, while Mr. Stomp did fail to promote Mr. Chavez based

on religion cannot be reconciled.  In fact, prior to the jury verdict, the Court recognized that it would be a logical fallacy for the jury to find that Mr. Stomp was liable while the Water Authority was not.  8/22/12 Tr. at 84 (the Court) ("They're not going to find Stomp liable and not find the Water Authority liable.  It just wouldn't work because if the Water Authority didn't do anything wrong, how could an employee be held responsible for doing something wrong?").

The only reasonable explanation of the jury's findings lies in Plaintiff's theory that the jury could find a violation of the First Amendment, without finding that the violation prevented Mr. Chavez's promotion.  After the close of evidence, Plaintiff suggested—to the surprise of Defendants and the Court—that the case was not entirely about failure to promote.  *See* 8/22/12 Tr. at 26 (Mr. Juarez) ("Defendant Stomp retaliated against Plaintiff.  That's the retaliation claim, not necessarily just promote."); *id.* (Mr. Flores) ("Except that the retaliation arguments made by Plaintiff have always been the failure to promote."); *id.* at 27 (the Court) ("I didn't think there was anything else in this case except failure to promote.").

Importantly, however, Plaintiff's surprise theory of a possible constitutional violation separate from a failure to promote was tied to a theory of nominal damages.  To the extent Plaintiff could establish that Mr. Stomp violated his Constitutional rights outside the context of failure to promote, no evidence was presented concerning any damages suffered apart from failure to promote.  Accordingly, if the jury somehow concluded that Mr. Stomp violated Mr. Chavez's Constitutional rights, but that such violation did not contribute to the failure to promote Mr. Chavez, as Plaintiff recognized, the jury could only have awarded nominal (and perhaps punitive) damages.  *See* 8/22/12 Tr. at 32 (Mr. Juarez) ("[A]s the Court has indicated, Your Honor, that you're having trouble trying to figure out what the damages are and the jury has the same question, but they find that Mr. Stomp's conduct was offensive, and offended the

16

Constitution and they say, Well, Mr. Juarez, you weren't too clear on your damages, but you know what? We find that Mr. Stomp's conduct violated the Constitution. Therefore, we want to give your client nominal damages . . . ."); 8/22/12 Tr. at 71 (Mr. Juarez) (closing argument) ("even though you can't say his job was denied him, that the promotions were denied him on that basis, if you find his constitutional rights were denied that much, then give him a dollar, give him $100, give him whatever you think nominal damages. And then turn to these people and you say, No. We're going to punish you"); 8/22/12 Tr. at 85-86 (Mr. Juarez) ("[T]he jury could say, Look. We're not comfortable with the idea that Stomp used his position of authority to prohibit Mr. Chavez from getting any jobs, but we are convinced that he did violate Mr. Chavez's rights by advancing religion on him. And, therefore, we can't find that there's any damages as a result of his conduct, . . . and, therefore, the only thing we can award is nominal damages.").

The jury's inconsistent findings with respect to the Water Authority and Mr. Stomp reflect that Plaintiff likely convinced the Court that Plaintiff should recover for "proselytization" alone. Yet, no evidence was presented indicating that Plaintiff suffered any damages apart from those he claimed to suffer by virtue of not being promoted. And even Plaintiff conceded that a constitutional violation separate from failure to promote would only entitle Mr. Chavez to nominal damages. Because it appears from the jury's special verdict form that the jury accepted Plaintiff's proselytization-alone theory, but elected to award compensatory damages, the Court should set aside the award of compensatory damages, and enter an award of nominal damages.

**V.     REMITTITUR IS ALSO REQUIRED TO ADDRESS PLAINTIFF'S MISREPRESENTATIONS ON HIS APPLICATIONS FOR THE POSITIONS AT ISSUE.**

In the event the Court rejects the above arguments, remittitur is nonetheless appropriate to address the impact of Mr. Chavez's application fraud. Mr. Chavez's own testimony at trial

revealed that he had made numerous misrepresentations on applications and resumes he submitted to the Water Authority in an effort to obtain the promotions at issue in this action. *See, e.g.* Tr. at 206, 211 (one resume included two years spent in a position in Los Angeles, as part of time spent in a different position in Orange County); *id.* at 208 (Mr. Chavez at one time reported two years in position at Nevada Power, and at another time, reported five years in same position at Nevada Power); *id.* at 210 (admitting that he added time spent in one position to time spent in two other positions on different occasions).

Mr. Chavez admitted to omitting information from his applications and "optimizing" his employment history and "customizing" his applications. *See* Tr. at 215-18; *see also* Tr. at 296 ("I did attempt to tailor my resume in accordance with the job requirements hoping to improve my chances as a candidate."). But Mr. Chavez's testimony made clear that he had not simply put the best possible spin on his experience. Quite the contrary, the evidence presented at trial revealed that misrepresentations made in Mr. Chavez's applications were used to misrepresent supervisory experience that Mr. Chavez did not have.

In the application that Mr. Chavez described as the most accurate, Mr. Chavez represented that he had a total of two years of supervisory experience, that supervisory experience coming from his position at Nevada Power Company during the period of August 1997-October 1999. Tr. at 221-223; Water Authority's Exhibit B (August 14, 2001 Application); Tr. at 280. Mr. Chavez subsequently added supervisory experience, representing that he had three years of supervisory experience in his position with the Chino Basin Water District—in direct contravention of his representation in his 2001 Application that he did not supervise employees at Chino Basin Water District. Tr. at 222, 225, 228; Water Authority Exhibit C (June 6, 2007 Application); Water Authority Exhibit B. Furthermore, Mr. Chavez increased the number of

18

years he claims to have supervised employees at Nevada Power Company.  In contrast to his 2001 representation that he had supervised employees for two years at Nevada Power, Mr. Chavez represented in 2007 that he supervised employees for five years at Nevada Power—and in doing so misrepresented that he had worked at Nevada Power for 5 years, when he had previously represented that he worked at Nevada Power for just two years.  Water Authority Exhibits B-C; Tr. at 223, 225.  Thus, in his 2007 application, Mr. Chavez added six years to his alleged supervisory experience (with the same employers) prior to becoming employed by the Water Authority.  Tr. at 229.  Moreover, at one point Mr. Chavez misrepresented that he had supervisory experience totaling thirteen years, eight months—a huge jump from the two years he reported in the application he described as the most accurate.  *See* Exhibits B, O.

Mr. Chavez's representations concerning his experience prior to joining the Water Authority were highly significant, given that Mr. Chavez has not directly supervised any employees during the entire course of his employment with the Water Authority.  *See* Tr. at 368.  Indeed, Mr. Chavez's lack of supervisory experience undermines his claim that he should have received the various promotions at issue in this action.  Importantly, all of the positions for which Mr. Chavez applied required at least a minimum of four years of supervisory experience.  Tr. at 493.  Although the Water Authority was not aware at the time it considered Mr. Chavez's applications that he lacked the requisite supervisory experience for the positions, his misrepresentations are nonetheless relevant to his claims.  The Court should consider Mr. Chavez's misrepresentations, and the fact that Mr. Chavez was not qualified for the promotions at issue, by applying the after-acquired evidence doctrine.[4]

---

[4] The Water Authority moved for judgment as a matter of law on the ground that Mr. Chavez's own testimony establishing that he did not have the qualifications he represented that he had when he applied for the positions at issue.  *See* Tr. at 346.

19

"The after-acquired evidence doctrine has its foundation in the logic that an employee cannot complain about being wrongfully discharged because the individual is no worse off than he or she would have been had the truth of his or her misconduct been presented at the outset." *Crawford Rehabilitation Services, Inc. v. Weissman*, 938 P.2d 540, 547 (Colo. 1997).   The United States Supreme Court applied the after-acquired evidence doctrine in *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 361 (1995), concluding that it needed "to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing."   The Court applied the doctrine to limit damages, concluding that "in cases of this type, neither reinstatement nor front pay is an appropriate remedy."   *Id.* at 361-62.   "The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered. *Id.* at 362.

*McKennon's* damage limitation does not lend itself well to the facts of this case, where Mr. Chavez is still employed by the Water Authority.   Nonetheless, the logic of the after-acquired evidence doctrine applies here, where Plaintiff claimed that he should have been promoted to positions for which he was not qualified.   The evidence at trial established that Plaintiff made a number of misrepresentations on his applications for the promotions directly at issue in this case. Those misrepresentations were not insignificant, but rather, allowed Plaintiff to appear to meet the minimum qualifications of the positions at issue when he in fact lacked those minimum qualifications.   Thus, Mr. Chavez is no worse off even if Mr. Stomp retaliated against him, because he was not qualified for the promotions forming the basis of his claims.   *See Crawford*, 938 P.2d at 547.

20

Mr. Stomp is mindful that the jury's finding of a constitutional violation cannot be entirely excused by a determination that Plaintiff should not in any event have been selected for the positions at issue.  But *McKennon's* discussion on taking into account the employer's prerogatives, and the underlying theory of not putting an employee in a better position than he would have been absent misrepresentations apply here.  *See McKennon*, 513 U.S. at 361; *Crawford*, 938 P.2d at 547.  The Court should exercise its discretion in the interests of equity to ensure that Mr. Chavez does not unfairly benefit from the material misrepresentations he made when applying for the positions at issue in this action.

As detailed above, the jury awarded Mr. Chavez more damages than he possibly could have sustained by not receiving the promotions at issue.  Because the jury's compensatory-damage award has no apparent connection to the evidence presented, it is admittedly difficult to determine what damages should be eliminated under the after-acquired evidence doctrine.  The Water Authority submits, however, that the reduction proposed in section III above is also an appropriate application of the after-acquired evidence doctrine.  By reducing the award based on the assumption that Mr. Chavez would have received the 2008 program-manager position, the Court can address the possibility that the significant award in excess of that figure amounted to an attempt by the jury to award Mr. Chavez front pay.  Because Mr. Chavez was not qualified for any of the positions for which he applied, he is not entitled to damages intended to account for the fact that his current salary is not as high as it would be if he had been promoted.  *See McKennon*, 513 U.S. at 362.   Another alternative would be for the Court to enter an award of nominal damages, and respect the jury's finding of a constitutional violation by preserving an award of punitive damages.  Doing so would account for the fact that Mr. Chavez is not qualified for any of the positions at issue, while giving due weight to the jury's finding of a constitutional

violation.  *See id.* at 357 (after-acquired evidence doctrine should not cause violation to be

completely disregarded).

**VI.    PUNITIVE DAMAGES SHOULD NOT HAVE BEEN PRESENTED TO THE JURY.**

As the Water Authority pointed out at trial, Mr. Chavez did not seek punitive damages on his

claim against Mr. Stomp in his complaint.  *See* Amended Complaint, Doc. No. 14, Count III.

The Court elected, however, to hold that general language included in the complaint could be

interpreted to include a request for punitive damages.  *See* 8/22/12 Tr. at 42-44.  In so holding,

the Court observed that it was unlikely that the jury would award punitive damages, and noted

that it might reconsider its determination on the request for punitive damages if necessary.  *Id.*

(the Court) ("I don't have to read punitive damages into what he claims in Count I and Count II,

because he never referred to punitive damages.  He just talks about what damages the jury finds

in this matter.  So I think that's probably enough to cover.  I may reconsider that.  I don't think

this jury is going to come in with punitive damages, based on this case as I've heard it.  But if

they do, I could take care of it, because we have the special verdict.  And I'll hear argument on

punitive damages if it's necessary to hear them before I enter a judgment on the verdict.").

Reconsideration of the decision to read a request for punitive damages into general language

in Mr. Chavez's complaint is necessary now that the jury awarded punitive damages.  Mr. Stomp

submits that reading a request for punitive damages into the §1983 claim is not reasonable.  Mr.

Chavez merely generally requested "damages as may be found by a jury" through his § 1983

claim.  Being aware of the distinction between punitive and compensatory damages, and having

asserted a § 1983 claim under which punitive damages are available, Plaintiff should have

specifically requested punitive damages if he intended to seek them.  Having chosen not to

request punitive damages, Plaintiff was not entitled to have the jury consider the issue of punitive damages.

Furthermore, even if Mr. Chavez had requested punitive damages, there was insufficient evidence that Mr. Stomp acted with a culpable mental state to allow the jury to consider punitive damages.  To the extent the Court again concludes that Mr. Chavez requested punitive damages, it should have granted judgment as a matter of law on the issue of punitive damages.  *See* Fed. R. Civ. P. 50; *Campbell v. Bartlett*, 975 F.2d 1569, 1582 (10th Cir. 1992).

"Punitive damages are awarded in the jury's discretion to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Smith v. Wade*, 461 U.S. 30, 54 (1983) (internal quotation marks and brackets omitted).  "[A] jury may be permitted to assess punitive damages in an action under *§ 1983* when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56.  "The focus is on the character of the tortfeasor's conduct -- whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards." *Id.* at 54.

The evidence presented at trial, even when viewed most favorably to Mr. Chavez, was not sufficient for the jury to conclude that Mr. Stomp acted with an evil motive or with callous indifference to Mr. Chavez's rights.  Rather, viewing the evidence in the light most favorable to Mr. Chavez, the evidence could at most establish that Mr. Stomp gave Mr. Chavez a bible and invited him to church during what he understood to be a difficult time in Mr. Chavez's life; and that Mr. Stomp's conduct made Mr. Chavez uncomfortable.  The evidence presented at trial falls far short of indicating, however, that Mr. Stomp intended to make Mr. Chavez feel uncomfortable or to violate his constitutional rights.  In fact, the evidence presented concerning

23

Mr. Stomp's intent suggests that his intentions were sincere—although they were apparently not perceived as such by Plaintiff.  In particular, Mr. Stomp believed that he was helping Mr. Chavez through struggles in his life, including his divorce, and accusations that he had sexually abused his children, in the same way that he had dealt with struggles in his life—through religion.  Tr. at 353-357.  In fact, Mr. Stomp wrote a message for Mr. Chavez on the bible he shared with him, indicating that he hoped God would be with him during his difficult times.  Tr. at 356.

Furthermore, as explained above, there is no evidence indicating that Mr. Stomp considered Mr. Chavez's response  to the "religious advances" when making promotion decisions or advocated against the selection of Mr. Chavez for the promotions at issue.  Mr. Chavez had in fact not given Mr. Stomp any reason to believe the "religious advances" were not well-received, giving Mr. Stomp no reason to choose to retaliate.  *See* Tr. at 359 (Mr. Chavez informed Mr. Stomp that he was reading a bible, and was going to church).  Moreover, as discussed above, Mr. Chavez's retaliation claim is founded solely on Mr. Stomp's presence on interview panels.  Yet, the hiring decisions were made collectively by a panel—Mr. Stomp did not have veto authority or the power to alone select a candidate.  *See* Tr. at 407-408;  Tr. at 310-11.  And the alleged religious advances occurred in 2003, long before Mr. Chavez applied for the positions at issue. *See* Tr. at 345, 34-37, 264-267, 353-356; *see also* Tr. at 332-339. No evidence was presented even suggesting that Mr. Stomp intentionally or maliciously considered Mr. Chavez's purported resistance to his alleged advances years earlier in an effort to ensure he was not promoted, or engaged in outrageous conduct with callous disregard for Mr. Chavez's rights.  *See Smith*, 461 U.S. at 54-56.  There was accordingly not a triable issue of fact concerning punitive damages, and the Court should have granted judgment as a matter of law on punitive damages.  *See* Fed. R. Civ. P. 50.

## VII.    THE AWARD OF PUNITIVE DAMAGES IS EXCESSIVE.

In the event the Court refuses to grant judgment as a matter of law in favor of Mr. Stomp on Mr. Chavez's punitive-damages claim, the Court should use remittitur to address the excessive punitive damages awarded by the jury.  *See Garrick v. City and County of Denver*, 652 F.2d 969, 971-72 (10th Cir. 1981).   Although "[t]here is no bright line between an acceptable and an unacceptable award of punitive damages[,] . . . the standard is one of reasonableness."  *Klein v. Grynburg*, 44 F,3d 1497, 1504 (10th Cir. 1995).    "This court [has] delineated that standard as whether the punitive damage award was so excessive that is shocks the judicial conscience or leads to the inescapable inference that it resulted from improper passion or prejudice on the part of the jury."  *Id.*

The jury's award of $100,000 in punitive damages is not reasonable, and reflects passion or prejudice on the part of the jury.  As detailed above, there was no evidence on which the jury properly could have awarded punitive damages.  Thus, there certainly was not sufficient evidence of an evil motive or intent on the part of Mr. Stomp sufficient to justify the significant punitive-damages award.   Insofar as the Court concludes that submission of the question of punitive damages to the jury was appropriate, remittitur should be used to reduce the patently excessive award of punitive damages.

## VIII.   CONCLUSION

For the foregoing reasons, Mr. Stomp respectfully asks the Court to grant judgment as a matter of law in his favor on Mr. Chavez's § 1983 claim, or on Mr. Chavez's punitive-damages claim.  In the alternative, the Court should order a remittitur to resolve the excessive compensatory and punitive damage awards made by the jury.

Respectfully submitted,

STELZNER, WINTER WARBURTON,
FLORES, SANCHEZ & DAWES, P.A.
Attorneys for Defendants
Post Office Box 528
Albuquerque, New Mexico  87103
Phone:  (505) 938-7770
Email:  jflores@stelznerlaw.com

*Electronically filed*

BY: _/s/  Juan L. Flores_____
        JUAN L. FLORES

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 30th day of January, 2013, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Santiago Juarez
Email: santiagojuarezlaw@gmail.com; ejuarez@santiagojuarezlaw.com;
        Santiago@santiagojuarezlaw.com

_/s/ Juan L. Flores_____
Juan L. Flores

S:\TXTLIB\10421\Pleadings\post trial motion - 1-30-13.docx