## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JAMES CHAVEZ,**

    **Plaintiff,**

**vs.**                **Civ. No. 10-205 JCH/ACT**

**JOHN STOMP, Individually and**
**in his Official Capacity as an employee**
**and supervisor of CITY OF ALBUQUERQUE**
**WATER UTILITY AUTHORITY, and the**
**CITY OF ALBUQUERQUE, A MUNICIPALITY,**
    **Defendants.**

### MEMORANDUM OPINION AND ORDER

   This matter is before the Court on Defendants' *Motion for Judgment as a Matter of Law, or in the Alternative To Alter or Amend Judgment.*  [Doc. No. 100, filed 1/30/13]  Plaintiff filed a Response [Doc. No. 102, filed 2/25/13], and Defendants filed a Reply [Doc. No. 103, filed 3/13/13].

   The Court has reviewed the pleadings and the relevant law.  The Court concludes that the Motion should be denied.

### BACKGROUND

   Plaintiff, a Hispanic male, worked for almost twelve years as a Senior Engineer; originally his employer was the City of Albuquerque, which later transitioned into the Water Authority.  [Doc. No. 95, pp. 21, 28, 119]  At the time of trial Plaintiff was still employed by the Water Authority, still as a Senior Engineer—the same job level at which he was hired eleven years earlier.  [Doc. No. 95, p. 191]  Plaintiff has a Master's degree in environmental engineering, and a number of professional certifications in various areas.  [Doc. No. 95, pp. 22, 26-27]  A

2001 Performance Evaluation and Counseling form showed that Plaintiff exceeded expectations in each category.  [Doc. No. 95, pp. 29-30]  He testified that this was the only written evaluation of his performance—characterizing a later evaluation was just a "mock" evaluation for practice.  [Doc. No. 95, pp. 29-30, 144-48]  Plaintiff was recognized for outstanding work as a project manager on the North I-25 Reused Water Project.  [Doc. No. 95, pp. 32-33]  He was commended for his good work in 2009 to 2010.  [Doc. No. 95, pp. 48-49]

Defendant Stomp became Plaintiff's supervisor in 2001.  [Doc. No. 95, pp. 27-28]

According to Plaintiff, he was experiencing success in his employment, but then that changed.  After a sequence of events in Fall 2003, Plaintiff testified, he noticed that he was being relieved of responsibility and he was not being invited to project progress meetings any more; it became obvious that he was being isolated.  [Doc. No. 95, p. 33]  He testified that he believed that these changes occurred as a result of that sequence of events in Fall 2003.  [Doc. No. 95, p. 34]

Plaintiff testified that he was served with divorce papers in Fall 2003; the papers were sent to his work address and received by Defendant Stomp and his administrative assistant.  [Doc. No. 95, pp. 35, 240]  Plaintiff testified that he disclosed very little of his life to Stomp because he was embarrassed and considered it a private matter; Plaintiff did not want to discuss his situation with Stomp and did not see Stomp as a person whom he wanted to ask for advice or counseling.  [Doc. No. 95, pp. 35-36]  Plaintiff testified that he did not ask Stomp for advice or want to discuss personal matters with Stomp.  [Doc. No. 95, pp. 36, 86]  Plaintiff was charged with sexual abuse of his daughters in Fall 2003; after trial, he was acquitted of all charges.  [Doc. No. 95, pp. 35-38]

Plaintiff testified:  "During that whole mess, Mr. Stomp would give me admonishments, would be, 'James, the reason you're having trouble is because you haven't accepted God into your life."  [Doc. No. 95, p. 86]  There were two such admonishments.  [Doc. No. 95-1, p. 7]  Chavez testified that Stomp "out of nowhere, says, 'Come to my church.  It meets at the Lobo Theater at Friday nights at seven o'clock.'"  [Doc. No. 95, p. 34]  Chavez testified that he did not know how to respond, that he did not attend Stomp's church, but that Stomp asked him "several more times after that" and that they were more of a demand than a request.  [Doc. No. 95, p. 35; Doc. No. 95-1, pp. 5-6]  Stomp also gave Chavez a Bible, which Chavez accepted "under duress," because he did not want to alienate his supervisor "by slighting him by refusing the gesture of a Bible." [Doc. No. 95, p. 35]  The Bible, which Stomp gave to Chavez at work, had a handwritten note on the inside cover:  "To James Chavez from John Stomp.  May God be with you during these difficult times."  [Doc. 95, p. 37]

In 2005 Plaintiff was transferred to a remote site, temporarily assigned to Pino Yards. [Doc. No. 95, p. 41]  This was the site where heavy equipment was kept.  Plaintiff's assignment was not consistent with the kind of work he was doing earlier; he testified that his "identity changed," and he was not a project manager any more.  [Doc. No. 95, p. 41]  Another eight or nine months after his "temporary" transfer, his job description was fundamentally changed.  [Doc. No. 95, p. 42]  In terms of his professional career, Plaintiff testified that it was "stifling," because he "became increasingly undertasked" and the "pattern of continued marginalization"—reducing Plaintiff's role and responsibilities—continued.  [Doc. No. 95, pp. 43-45, 87]  He testified that he "felt persecuted as a result of [his] religious beliefs," and that he was isolated, marginalized, stripped of responsibility, and could not get promoted.  [Doc. No. 95, p. 87]  He testified that at the time of trial Defendant Stomp continued to marginalize him, and had "made it his business to

strip" Plaintiff of responsibility.  [Doc. No. 95, p. 100]  Plaintiff testified that his professional development was inhibited if he did not have meaningful participation in project development and project management.  [Doc. No. 95, p. 43]  He stated that this marginalization would make his resume less attractive when applying for promotions, and would prevent him from advancing in his career.  [Doc. No. 95, p. 43]  He testified that he never received any letters of reprimand or negative evaluations.  [Doc. No. 95, pp. 43-46]  Plaintiff testified that he was "in exile at the hands of Mr. Stomp," that he was a "pariah," and that he was "placed into institutional isolation in a remote site."  [Doc. No. 95, p. 161]  Although the 2005 transfer to Pino Yards was supposed to be temporary, Plaintiff was there until he was moved to the water reclamation plant in the middle of 2010.  [Doc. No. 95, pp. 46-48]

Between December 2005 and January 2009, Plaintiff testified, he applied for many promotions:  to Principal Engineer, Chief Engineer, and Program Manager.  [Doc. No. 95, pp. 50-74, 113]  Plaintiff testified at length about the positions and the qualifications of the successful candidates; he compared his qualifications and testified that for most of the positions, he felt he was at least as qualified as the successful candidates.  [Doc. No. 95, pp. 50-78, 92, 96]

Plaintiff interviewed for eight of the promotions, but never received a promotion after 2001, when Defendant Stomp became his supervisor.  [Doc. No. 95, pp. 50, 75]  He testified that he stopped applying for promotions in December 2008, because there was no point and he "could see what the pattern was."  [Doc. No. 95, p. 74]  Defendant Stomp was on the interview panel for all but one of Plaintiff's interviews.  [Doc. No. 95, pp. 74, 183]

Plaintiff testified that he believed that less qualified non-minority candidates were selected over Plaintiff.  [Doc. No. 95, pp. 83-85]  He also testified that he believed he had been discriminated against on the basis of his religious beliefs, because Defendant Stomp had

considerable rank and influence and Plaintiff had rejected Stomp's religious values and "his repeated admonishment to accept Christ."  [Doc. No. 95, pp. 85-86]

Plaintiff testified that his current salary was $74,500 a year, after a 25% increase in 2010 in which he received an "equity adjustment" because his salary was below the minimum.  [Doc. No. 95, p. 87]  Plaintiff testified that a Chief Engineer's salary started "at six figures," and one he knew of was hired at $105,000.  [Doc. No. 95, p. 88]  He testified that in 2006 the salary ranges for a Principal Engineer and Chief Engineer were about $40,000 and about $50,000 more than the $45,000 he was receiving as a Senior Engineer, and that when his salary was increased those salaries increased a comparable amount.  [Doc. No. 93, pp. 48-49]

The Complaint stated three separate claims against the Water Authority and John Stomp: (1) Count I: racial discrimination under Title VII of the Civil Rights Act; (2) Count II: religious discrimination under Title VII; and (3) Count III: retaliation based on exercise of First Amendment rights under § 1983.  [Doc. No. 14, filed 12/23/10]  The Court granted partial summary judgment on Count III in favor of the Water Authority and Stomp in his official capacity as an employee; the Court ruled that Count III remained as a claim against Stomp in his individual capacity.  [Doc. No. 45, filed 1/4/12]

District Judge Eginton, Sitting by Designation, presided over the jury trial held on August 20, 2012, to August 23, 2012.  The jury found in favor of Defendants on Counts I and II.  [Doc. No. 90]  The jury found in favor of Plaintiff and against Defendant Stomp on Count III, awarding $180,000 in compensatory damages and $100,000 in punitive damages.  [Doc. No. 90]

## LEGAL STANDARDS

On a motion for judgment as a matter of law (JMOL), the court views the evidence in the light most favorable to the nonmoving party and determines whether there is evidence upon

which the jury could have properly relied in returning its verdict.  *Klein v. Grynberg*, 44 F.3d 1497, 1503 (10th Cir. 1995).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir. 2004). The court may not reweigh the evidence or substitute its judgment for that of the jury.  *Klein*, 44 F.3d at 1503.  When there is conflicting testimony regarding the events and the defendants' actions, it is the jury's prerogative to weigh the credibility of the witnesses and determine whom to believe.  *Id.* at 1503-04.  The court should grant the JMOL only if "'the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'"  *Hardeman*, 377 F.3d at 1112-13 (quoting *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1279 (10th Cir. 2003)).

A motion for JMOL under Rule 50(a) may be made at any time before the submission of the case to the jury.  Rule 50(a)(2)  requires the motion to "specify the judgment sought and the law and facts that entitle the movant to the judgment."  *See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1260 (10th Cir. 1999) (motion for JMOL must notify opposing party of specific deficiencies in proof alleged).  "Giving a party a chance to correct defects in proof is a primary purpose of the preverdict motion for JMOL under Rule 50(a), and in particular of the requirement that the motion specify the grounds for granting judgment." *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1260 (10th Cir. 1999) (observing that party can move for leave to reopen its case to provide additional evidence); *see* Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment (stating that purpose of requirement for pre-verdict motion for JMOL "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked"); *Waters v. Young*, 100 F.3d 1437, 1442 (9th Cir. 1996) (cited by *Morrison Knudsen Corp.*, 175 F.3d at 1260) (holding

that party must be apprised of specific deficiencies in its proof and that court must allow party opportunity to offer further evidence before granting JMOL).

The Tenth Circuit has stated that it "liberally construe[s] Rule 50 in light of its purpose 'to secure a just, speedy, and inexpensive determination of a case,'" and that "[t]echnical precision" in stating the grounds of a motion for JMOL is unnecessary. *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000) (quoting *Anderson v. United Tel. Co.*, 933 F.2d 1500, 1503 (10th Cir. 1991)); *see also Dillon v. Mountain Coal Co.*, 569 F.3d 1215, 1221 (10th Cir. 2009). "A rigid application of the rule is in order only if such application serves either of the rule's rationales—protecting the right to trial by jury or ensuring an opposing party has sufficient notice of an alleged error so that it may be cured before the party rests its case." *United Int'l Holdings, Inc.*, 210 F.3d at 1229. "While Rule 50 'does not require technical precision in stating the grounds of the motion[,] [it] does require that they be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position with respect to the motion.'" *Id.* (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2533, at 310 (1995)). "'The statement of one ground precludes a party from claiming later that the motion should have been granted on a different ground.'" *Id.* (quoting § 2533).

The motion for JMOL may be renewed after trial under Rule 50(b) no later than twenty-eight days after the jury is discharged. "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment; *see Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1250 n.1 (10th Cir. 2013) (observing sufficiency of evidence issue requires both Rule 50(a) motion at close of evidence and Rule 50(b) motion after verdict); *Elm Ridge*

*Exploration Co. v. Engle*, 721 F.3d 1199, 1219 (10th Cir. 2013) (observing that precise subject matter of Rule 50(a) motion must be renewed under Rule 50(b)).   "Rule 50(a) may not be circumvented 'by raising for the first time in a post-trial motion issues not raised in an earlier motion for directed verdict.'"   *Robinson v. Cavalry Portfolio Servs., LLC*, 365 Fed. Appx. 104, 111 (10th Cir. 2010) (unpublished) (quoting *United Int'l Holdings, Inc.*, 210 F.3d at 1228).   This limitation was also expressed in the note to the 1991 amendment:

> This provision [Rule 50(b)] retains the concept of the former rule that the post-verdict motion is a renewal of an earlier motion made at the close of the evidence. One purpose of this concept was to avoid any question arising under the Seventh Amendment.   *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940).   It remains useful as a means of defining the appropriate issue posed by the post-verdict motion.   A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.   *E.g.*, *Kutner Buick, Inc. v. American Motors Corp.*, 848 F.2d 614 (3d Cir. 1989).

Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment.

The limitation of the grounds in the Rule 50(b) motion to those previously raised in the Rule 50(a) motion provides an opportunity for the opposing party to remedy a deficiency in evidence and for the court to simplify the trial:

> The earlier motion [under Rule 50(a)] informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available.   The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury.   This fulfillment of the functional needs that underlie present Rule 50(b) also satisfies the Seventh Amendment.

Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment.

## **DISCUSSION**

Defendant Stomp raises six issues:   (I) Whether there was sufficient evidence to support the claim of retaliation under § 1983; (II) Whether remittitur is warranted because there was insufficient evidence to support the compensatory damages awarded; (III) Whether remittitur is

warranted because the jury verdicts are inconsistent; (IV) Whether remittitur is justified under the after-acquired evidence doctrine; (V) Whether it was error to submit the issue of punitive damages to the jury when not specifically requested in the Complaint, and whether there was sufficient evidence to support the punitives awarded; and (VI) Whether remittitur is warranted because the punitive damages awarded were excessive.

## I.  Sufficiency of Evidence

Defendant Stomp argues that there was insufficient evidence of retaliation to allow a reasonable jury to find for Plaintiff.  [Doc. No. 100, pp. 3-7]  The jury instruction required proof that Defendant Stomp violated Plaintiff's "First Amendment right to practice his religion or not to adhere to religion" and that "free exercise of [Plaintiff's] religion was a substantial or motivating factor in defendant Stomp's decision to retaliate."  [Doc. No. 86, p. 3]  *See Schuler v. City of Boulder*, 189 F.3d 1304, 1308-10 (10th Cir. 1999) (discussing First amendment retaliation claim); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000) (discussing elements of § 1981 retaliation claim).  Defendant argues that Judge Eginton should have granted judgment as a matter of law on the § 1983 claim—but Defendant did not make a pre-verdict motion for JMOL on this basis.

### A.  Grounds for Rule 50(b) motion

Defendant Stomp makes a post-verdict motion for JMOL on grounds not raised in Defendants' pre-verdict motion for JMOL.  But the Rule 50(b) motion is "only a renewal" of the Rule 50(a) motion, and cannot assert grounds not raised in the Rule 50(a) motion. Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment; *Robinson*, 365 Fed. Appx. at 111.  Defendant may not circumvent Rule 50(a) by raising for the first time in a post-verdict motion issues not raised in the pre-verdict motion.  *See United Int'l Holdings, Inc.*, 210 F.3d at 1228.

After Plaintiff's case in chief, Defendants orally moved for a "directed verdict," arguing that there was insufficient evidence that either religious or racial discrimination caused the panels not to choose Chavez for the jobs for which he applied.  [Doc. No. 95-1, pp. 84-86] Defendants' entire argument follows:

Defense Counsel:  We move for directed verdict.  We have the claims of religious discrimination, the claims of racial discrimination.

With respect to the claims on religious discrimination, we've heard all of the testimony, and the testimony thus far has been comments pertaining to religion occurred in 2003 at the time that the plaintiff was having the difficulties that we've heard about.  Nothing after that.  And again, the plaintiff was an employee of the City of Albuquerque at the time, did not become an employee of the Water Authority, a completely separate and independent governmental entity, until July 7 of 2007.

We have all the testimony relating to what the interview process is, the fact that there are questions, the fact that there are a minimum of two, a maximum of four panelists, what the interview process is, the type of questions, the back and forth that goes on.  Specifically, we've had information from the plaintiff himself regarding the fact that he doesn't have the years of experience that he initially claimed he had or the massaging or customizing of his experience and the massaging or customizing of his supervisory experience.  Those numbers are significant.

Really, Your Honor, with respect to racial discrimination, we don't have any evidence that in fact any of the positions involved a discussion by any of the panel members involving religion.  We don't have any testimony that there was any decision from any of those panel members for any of the decisions that was based on religion or the lack thereof.

It's the same thing with respect to racial discrimination.  The only thing that we have are what Your Honor called the stray remarks regarding the brown niggers and spics, certainly despicable remarks.  Nobody would dispute that.  Remarks that weren't made by Mr. Stomp.  Remarks that weren't made in connection with any application with any position, and even Mr. Montgomery added he had never seen the declaring of those remarks exercised in any action which was in any way indicative of racial discrimination or religious discrimination.

Those are the two claims that are brought by the plaintiff.  They are brought not only against Mr. Stomp, and we haven't had any testimony that somehow Mr. Stomp has bought into any racial discrimination or racial concepts

or racial preferences, but they are also brought against the Water Authority who was not the plaintiff's employer until July 7th of 2007.  So on that basis, Your Honor, we would move for a directed verdict.

[Doc. No. 95-1, pp. 84-86]   This is Defendants' entire argument for a directed verdict. Defendants made no argument about Count III, which alleged retaliation by Stomp based on Chavez's exercise of his First Amendment rights.

After Defendants' case and Plaintiff's rebuttal, Judge Eginton indicated that he considered Defendants' motion renewed, that he reserved his ruling, and that Defendants had preserved their issues.  [Doc. No. 93, p. 49 ("I'll deem the motions made and ruled upon and will reserve to the end of the jury verdict.  But they're preserved.")]  Judge Eginton stated that "the defense has set the ground which it should set for renewal of those motions at the end of the defense case" and "again, when the jury verdict comes in, if it is necessary to do it."  [Doc. No. 95-1, p. 91] Defendants presented no additional argument, nor did they request the opportunity to expand on their pre-verdict JMOL.

In the post-verdict motion for JMOL, Defendant Stomp argues that there was insufficient evidence of retaliation in violation of § 1983 to submit the § 1983 claim to the jury—in particular, that there was insufficient evidence of a causal connection between Plaintiff's rejection of Stomp's religious advances and retaliatory acts and insufficient evidence that Plaintiff even rejected Stomp's proselytization.  But Defendants failed to make these arguments in the pre-verdict motion for JMOL.

Although "technical precision" was not required, Defendants were required in their pre-verdict JMOL to state their grounds "with sufficient certainty to apprise the court and opposing counsel of the movant's position."  *United Int'l Holdings, Inc.*, 210 F.3d at 1229.  "[M]erely moving for directed verdict is not sufficient to preserve any and all issues that could have been,

but were not raised in the directed verdict motion." *Id.* In *United Int'l Holdings, Inc.*, the Tenth Circuit held that the defendant failed to preserve a challenge to the sufficiency of evidence on compensatory damages; although the defendant made a long oral motion for directed verdict covering "a multitude of subjects," the defendant did not once mention damages. 210 F.3d at 1228. The Tenth Circuit concluded that, no matter how liberally the "specific grounds" requirement of Rule 50 is construed, the defendant failed to satisfy this requirement. *Id.* at 1229.

In the case before the Court, Defendants' pre-verdict motion for JMOL did not raise the ground of sufficiency of the evidence on Count III. The pre-verdict motion did not once mention retaliation or causal connection. As in *United Int'l Holdings, Inc.*, no matter how liberally the "specific grounds" requirement is construed, Defendant Stomp may not raise in his post-verdict motion the issue of sufficiency of the evidence on the retaliation count. To permit him to do so would contravene the rationales of Rule 50—protecting the right to trial by jury, and ensuring that Plaintiff had sufficient notice of the allegation of insufficient evidence to allow Plaintiff an opportunity to cure any deficiency. *Id.* "Giving a party a chance to correct defects in proof is a primary purpose of the preverdict motion for JMOL under Rule 50(a), and in particular of the requirement that the motion specify the grounds for granting judgment." *Morrison Knudsen Corp.*, 175 F.3d at 1260 (10th Cir. 1999); *see* Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment (stating that purpose of requirement for preverdict motion for JMOL "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked"). Defendants were required to challenge the sufficiency of the evidence on the retaliation count before the case was submitted to the jury, so that Plaintiff would have had the opportunity to offer further evidence or move to reopen his case to provide additional evidence. *See Morrison Knudsen Corp.*, 175 F.3d at 1260; *Waters*, 100 F.3d at 1442.

The Court recognizes that the Tenth Circuit has indicated that the opposing party waives an appellate argument if that party fails to raise in district court the argument that a Rule 50(b) motion improperly raises issues not previously raised under Rule 50(a).  *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1076 n.3 (10th Cir. 2002); *Robinson v. Cavalry Portfolio Servs., LLC*, 365 Fed. Appx. 104, 111 (10th Cir. 2010) (unpublished).  The Court believes, however, that it is the district court's responsibility to enforce the dictates of the Rules in district court when the court is aware of a violation, and that violation contravenes the primary purpose of the Rules; the Court reasons that it is particularly important under the circumstances of this case because an instructional error or deficiency of proof could have been cured before the case was submitted to the jury.  The Court concludes that Defendant Stomp may not now challenge the sufficiency of the evidence on retaliation because that issue was not raised in the pre-verdict motion for JMOL.

## B.  "Any evidence"

The Tenth Circuit has stated that it will nevertheless review denial of a post-trial motion for JMOL which raises an issue which was not raised in a pre-verdict motion for JMOL—but on a different standard.  *United Int'l Holdings, Inc.*, 210 F.3d at 1229.  The Tenth Circuit then reviews "only to determine if there is *any* evidence" to support the jury's finding on the disputed issue.  *Id.* at 1229.  This Court will determine whether there was "any evidence" to support the jury's finding for Plaintiff on Count III for retaliation.

Defendant Stomp argues that there was insufficient evidence of a causal connection between Plaintiff's rejection of Stomp's proselytizing and retaliatory acts.  But in making this argument Defendant focuses solely on one of Plaintiff's two bases for retaliation—the failure to

be selected for the promotions for which Plaintiff applied, and on only one type of damages—salary differences between Plaintiff's position and jobs for which he applied.

Defendant argues that "all of the evidence presented by Mr. Chavez concerning Mr. Stomp's alleged 'religious advances' or proselytization occurred in 2003—long before the decisions at issue in this case." [Doc. No. 100, p. 4] Defendant then argues that Plaintiff failed to show a causal connection with the failure to select Plaintiff for promotions from 2006 to 2008, citing caselaw allowing inference of a causal connection when an adverse action closely follows protected activity. [Doc. No. 100, pp. 4-5]

"A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see Miller v. Auto. Club*, 420 F.3d 1098, 1121 (10th Cir. 2005), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v.* White, 548 U.S. 53, 67-68 (2006). The Tenth Circuit has held that an adverse action six weeks after protected conduct may be sufficient, even without any other evidence, but adverse action three months later, without more, is insufficient to establish a prima facie case on causation. *Miller*, 420 F.3d at 1121. The Tenth Circuit has also held that "'[t]iming can be circumstantial evidence of retaliatory intent.'" *Hardeman*, 377 F.3d at 1120 (quoting *Poole v. County of* Otero, 271 F.3d 955, 961 (10th Cir. 2001), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006)). The Tenth Circuit has stated that "the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the [protected conduct] and only culminates later in actual discharge." *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 326, 329 (10th Cir. 1996). These cases show that even if timing alone may not be sufficient, "suspicious timing" does support the plaintiff's case on causation.

Plaintiff testified that three types of conduct violating his First Amendment rights occurred in the latter part of 2003:  twice admonishing Plaintiff for not accepting Christ into his life, several times inviting or demanding that Plaintiff attend Stomp's church, and giving Plaintiff a Bible.  Plaintiff testified that the first application he made for promotion was December 2005 and that he applied for at least eleven more promotions over the next two years.  [Doc. No. 95, p. 51]  The Court agrees with Defendant that, if failure to be selected for the promotions were the only retaliatory conduct alleged, two years would ordinarily be too long—without more—to support a reasonable inference of causal connection; perhaps, however, under the plain error standard applicable because of Defendant's failure to raise the issue under Rule 50(a), such an inference would still be sufficient to support the "any evidence" standard.  The Court need not decide this question, however, because Plaintiff alleged additional retaliatory conduct and presented additional evidence of causation.

Plaintiff alleged two types of retaliatory conduct.  First, Plaintiff argued that Stomp influenced the interviewing panels' decisions not to select Plaintiff for the particular promotions for which he applied.  Second, Plaintiff alleged that Stomp impeded Plaintiff's professional development and limited his professional experience so that Plaintiff was deprived of the ability to compete and had no "upward mobility."  [Doc. No. 93, p. 64]  A pattern of marginalization and reduction in responsibilities lowered Plaintiff's professional status.  The jury instruction allowed this second, broader theory by asking the jury whether Defendant Stomp retaliated "by preventing [Plaintiff's] promotion."  [Doc. No. 90, p. 2]  This broader language allowed a broader range of conduct than just preventing Plaintiff's "selection" for the particular promotions for which he applied.

Although Plaintiff did not refer to a specific date, Plaintiff testified that he noticed a pattern of marginalization and isolation which began after the incidents in Fall 2003.  [Doc. No. 95, p. 33]  Plaintiff testified that after those incidents, he began to notice that he was being relieved of responsibility and was not being invited to project progress meetings anymore.  [Doc. No. 95, p. 33]  He testified that he believed the adverse treatment was because of the Fall 2003 incidents.  [Doc. No. 95, pp. 33-34]  Chavez testified that his "not acquiescing to Mr. Stomp's religious values and his repeated admonishment to accept Christ" alienated Stomp.  [Doc. No. 95, p. 86] Sometime in the middle of 2005, Plaintiff was transferred to Pino Yards, which he described as continuing the trend of marginalization; he testified that he "became increasingly undertasked" and that stifled his professional development because he did not have "meaningful participation in projects, project development, or as a project manager."   [Doc. No. 95, pp. 42-43]  Plaintiff testified that this was part of the pattern of reducing his role and responsibilities.  [Doc. No. 95, p. 43]  Plaintiff testified that these actions made his qualifications less attractive when applying for promotion, and that they prohibited him from advancing in his career.  [Doc. No. 95, p. 43]  It was not just that Plaintiff was not selected for promotions for which he applied, but also that Plaintiff was deprived of the opportunity to improve his professional qualifications and his ability to compete.

Such a pattern of retaliation supports Plaintiff's claim.  *See Marx*, 76 F.3d at 326, 329 (determining that pattern of retaliatory conduct justified inference of retaliatory intent when protected conduct was immediately followed by numerous and continuing citations for job deficiencies, ultimately leading to discharge seven months after protected conduct); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 921 F. Supp. 1137, 1189-90 (D.N.M. 2013). The Tenth Circuit has "made clear that there were deprivations less harsh than dismissal which

nevertheless violated a public employee's rights under the First Amendment." *Schuler v. City of Boulder*, 189 F.3d 1304, 1309 (10th Cir. 1999). Transfer to another facility can constitute deprivation sufficient to violate the employee's rights. *Id.* (recognizing that transfer to another facility, even with same title and responsibilities constituted cognizable deprivation); *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1437-38 (10th Cir. 1990) (recognizing that transfer to another school constituted cognizable deprivation).

Plaintiff testified that the marginalization and isolation began "after a sequence of events"—referring to the Fall 2003 religious advances; the jury could rely on this "suspicious timing" to infer retaliatory intent and a causal connection. *See Hardeman*, 377 F.3d at 1115, 1120. Under the applicable standard of review, the Court concludes that the jury could make a reasonable inference that the marginalization, isolation, and reduction in responsibilities were retaliatory acts in response to Plaintiff's rejection of Stomp's religious advances; in so concluding, the Court is mindful that the lower standard, whether there was "any evidence," is applicable and not the ordinary standard for sufficiency of evidence. The Court also observes that if Defendant Stomp had raised the issue of sufficiency of evidence in a pre-verdict motion for JMOL, as required by Rule 50, Plaintiff may have been able to present further testimony on timing which would have better supported his claim. *See* Fed. R. Evid. P. 50 advisory committee's note to 1991 amendment (stating that purpose of requirement for pre-verdict motion is to allow opportunity to cure any deficiency in proof that may have been overlooked); *Morrison Knudsen Corp.*, 175 F.3d at 1260 (purpose of Rule 50 is to give party opportunity to correct defects in proof).

The Court concludes that, under these circumstances, it would be unjust to penalize Plaintiff for lack of greater clarity on the dates. The Court emphasizes that the retaliation at issue

is not just the failure to be selected for the specific promotions for which Plaintiff applied between 2005 and 2009, but also the marginalization and reduction of responsibilities. And the harm suffered was not just the failure to receive these specific promotions, but also the negative impact on Plaintiff's professional status and opportunities for future advancement in his career.

In addition, Defendant overlooks additional testimony that supports a causal connection. Carolyn Kennedy testified that she rented Chavez a room, because Chavez had no place to stay after he had to move out of his house because of his marital difficulties. [Doc. No. 95-1, p. 75] When Defendant Stomp was Kennedy's immediate supervisor, Stomp called her into his office and told her that "it was un-Christian-like for [her] to be living with" Chavez. [Doc. No. 95-1, p. 77] Kennedy explained that she did not have a romantic relationship with Chavez, that he was merely renting from her, that she was a Christian, and that she "would not be living and sleeping with anyone." [Doc. No. 95-1, p. 77] Previously Kennedy had a good working relationship with Stomp, but after this meeting that relationship changed; Stomp became difficult to work with and obstructed Kennedy's work as Safety Manager. [Doc. No. 95-1, p. 78] Kennedy testified that she became very uncomfortable as a result—so uncomfortable that she could not do her job; she retired, in part, for this reason (and also because her elderly parents were not well). [Doc. No. 95-1, pp. 78-80] Kennedy also testified that she had told her immediate supervisor, Ted Asbury, that Stomp was pressuring Chavez to go to church and trying to impose his religious beliefs on Chavez. [Doc. No. 95-1, pp. 78-79] Kennedy testified that on several occasions she had heard Stomp talking to Chavez and inviting Chavez to Stomp's church. [Doc. No. 95-1, p. 75]

In *Hardeman*, the defendant argued that there was insufficient evidence that the plaintiff was discharged in retaliation for protected speech, because the Mayor, who fired her, had no knowledge of the plaintiff's speech about an auditing controversy, and Trujeque, the person who

had knowledge, was not involved in firing the plaintiff. *Hardeman*, 377 F.3d at 1114. A witness testified that he discussed the auditing controversy with the Mayor and that the incident on which the plaintiff commented was the "talk of the office." *Id.* at 1114. There was circumstantial evidence that the Mayor and Trujeque talked on almost a daily basis. And the plaintiff was discharged soon after her protected speech. The Tenth Circuit concluded that there was not much direct evidence showing a causal connection between the plaintiff's speech and her discharge, but observed that a "lack of direct evidence is not, however, uncommon in retaliation cases like this one." *Id.* at 1114. The timing can provide circumstantial evidence of retaliatory intent. *Id.* at 1120. "'Precisely because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence.'" *Id.* at 1114 (quoting *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990)). The Tenth Circuit concluded that the circumstantial evidence was sufficient to support the jury verdicts for the plaintiff. *Id.* at 1115. That evidence included the "suspicious timing" of the plaintiff's discharge and the lack of evidentiary support for the defendants' proffered reason for firing the plaintiff. *Id.*

In *Hardeman*, the Tenth Circuit held that primarily circumstantial evidence, including "suspicious timing," was sufficient to support the jury verdict. In the case before this Court, the lower standard of whether there was "any evidence" is applicable. As in *Hardeman*, there was testimony by a witness supporting the causal connection; Kennedy testified that Stomp retaliated against her after she objected to Stomp's criticism of her "un-Christian" behavior. As in *Hardeman*, there was "suspicious timing"—supported by Plaintiff's testimony that the marginalization and reduction of his responsibilities followed his rejection of Stomp's religious advances. Also as in *Hardeman*, there was no convincing reason given for marginalizing Plaintiff; Plaintiff testified that he had received awards and had never been given a negative

performance evaluation.  Particularly on the lower standard applicable in the case before the Court, *Hardeman* supports the conclusion that Plaintiff met the standard of "any evidence."

The Court concludes that Plaintiff did present evidence of a causal connection and did not rely solely on an inference of retaliation from retaliatory conduct closely following protected activity.  Kennedy's testimony was that Stomp retaliated against her when Stomp criticized her on religious grounds, and after Kennedy rejected Stomp's religious advice to her.  This testimony supports a finding that Stomp tried to impose his religious beliefs on those he supervised and that Stomp would retaliate when opposed.  Kennedy's testimony further supports Plaintiff Chavez's claim by allowing the jury to infer that Stomp's criticism of Kennedy was directed at Chavez— another example of Stomp trying to make life difficult for Chavez after Chavez rejected Stomp's religious advances.  Direct evidence of causation is often unavailable.  *See Hardeman*, 377 F.3d at 1115.  The Court concludes that Plaintiff presented enough evidence to allow the jury to infer the requisite causal connection.

Defendant also argues that "no evidence was presented indicating that Mr. Stomp considered Mr. Chavez's response to the 'religious advances' when making promotion decisions, or advocated against the selection of Mr. Chavez for the promotions at issue."  [Doc. No. 100, p. 5]  Defendant further asserts that there was no evidence that Stomp prevented Chavez from being selected, because promotion decisions were made by a panel and there was no evidence that Stomp exercised influence on the other panelists or even advocated against Chavez.  [Doc. No. 100, p. 6]  First, as discussed above, these arguments depend on an unduly limited view of the retaliatory conduct at issue.  Second, there was testimony from David Montgomery that panelists discussed their rankings of the candidates, sometimes altered their rankings in response to such discussion, and gave extra weight to the opinion of the panelist who would be the direct

supervisor of the candidate selected.  [Doc. No. 95-1, pp. 50-51, 62-64]  Stomp acknowledged

that there was discussion of candidates, but testified that his ranking carried no greater weight

than that of any other panelist.  [Doc. No. 95-1, p. 148]  If the jury found Montgomery a more

credible witness than Stomp on this point, the jury could have concluded that Stomp did exercise

influence over other panelists and prevented Chavez's selection for promotion; Stomp sat on

almost all of the panels when Chavez was interviewed.  [Doc. No. 95, pp. 74, 183]  *See*

*Hardeman*, 377 F.3d at 1116 (recognizing that jury is free to discredit defendant's testimony as

biased).  Third, there is rarely direct evidence of intent in such cases; allegations of retaliation are

often supported only by circumstantial evidence, from which the jury may infer intent.  *See*

*Hardeman*, 377 F.3d at 1119-20.  Defendant's arguments are therefore not persuasive.

Defendant also fails to recognize that the jury may have awarded compensatory

damages—in whole or in part—for emotional harm or future damages.  *See Hardeman*, 377 F.3d

at 1118 (recognizing that jury may have awarded damages in First Amendment case for

emotional harm including stress).  The jury instructions explicitly allowed such damages.  [Doc.

No. 86, pp. 5-6]  Defendant did not object to this part of the instructions, either during earlier

discussions or when Judge Eginton specifically asked whether there were further objections after

he read the instructions to the jury.[1]  [Doc. No. 93, pp. 90, 176] There was testimony to support

an award of emotional damages.  Plaintiff testified that Stomp's proselytizing caused him

"[e]xtreme emotional distress," that he was "certainly uncomfortable" about it, and that he "felt

persecuted as a result of [his] religious beliefs."  [Doc. No. 95-1, pp. 30-31; Doc. No. 95, pp. 86-

---

[1] Although Defendant proffered an instruction that did not allow damages for emotional harm
[Doc. No. 69, p. 14 (filed 8/6/12)], Defendant did not in addition make a specific, detailed
objection, to the instructions allowing damages for emotional harm and future damages.  *See*
*Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1172 (10th Cir. 2003) (emphasizing that
proffer of jury instruction differing from instruction given does not preserve challenge to jury
instruction; party must both proffer an instruction and make a timely objection).

87]  Plaintiff testified that he told a colleague, Carol Kennedy, "I'm so tired of getting beat up by John's [Stomp's] Bible."  [Doc. No. 95, p. 34]  Kennedy testified that Plaintiff told her that Stomp's religious advances were unwelcome and made Plaintiff feel "very, very uncomfortable."  [Doc. No. 95-1, p. 76]  Plaintiff's frustration at being marginalized and relegated to jobs in which he was "undertasked" was clear in his testimony, as was Plaintiff's disappointment at not being able to advance in his career.

Defendant Stomp also argues that there was no evidence that Stomp had reason to believe that Plaintiff objected to Stomp's proselytizing and therefore had any motivation to retaliate.  [Doc. No. 100, pp. 5-6]  Stomp asserts:  "Mr. Chavez had in fact not given Mr. Stomp any reason to believe the 'religious advances' were not well-received."  [Doc. No. 100, p. 5]  Plaintiff testified that he declined to go to Stomp's church, but that he may not have said anything but "ultimately, [he] probably tried to sneak away as quietly as [he] could and [he] never attended [Stomp's] church."  [Doc. No. 95-1, pp. 265-66]  Plaintiff testified that he accepted the Bible "under duress" because he did not want to alienate his supervisor.  [Doc. No. 95, p. 35]  But there was evidence showing that Plaintiff did object to Stomp's religious advances.  Plaintiff testified that he had told a colleague, Carol Kennedy, about Stomp's proselytizing; without Plaintiff's knowledge, Kennedy had reported it to the department director who then spoke to both Stomp and Plaintiff about the problem.  [Doc. No. 95, pp. 33-34]  Plaintiff testified that he told the director that he wanted "the religious proselytizing" to stop.  [Doc. No. 95, p. 34]  Kennedy testified that she told her supervisor, Ted Asbury, that Stomp was pushing Plaintiff to go to his church and imposing his religious beliefs on Plaintiff; Kennedy testified that Plaintiff later told her that Asbury had called Plaintiff and Stomp in for a meeting on the problem.  [Doc. No. 95-1, pp. 75-76, 78-80]  Kennedy testified that she quit in October of 2004 (in part because Stomp's

religious harassment of her made her so uncomfortable); therefore, this meeting must have taken place before October 2004.  [Doc. No. 95-1, p. 79]  Contrary to Defendant Stomp's assertion, there was evidence before the jury that Stomp was informed that Plaintiff objected to Stomp's religious advances.

The Court concludes that there was sufficient evidence from which the jury could find that Plaintiff rejected and objected to Stomp's religious advances, and evidence from which the jury could find a causal connection with retaliatory conduct.  The Court concludes that there was sufficient evidence to support the § 1983 retaliation claim, and that there was certainly enough evidence to meet the standard of "any evidence" for an issue first raised in a post-verdict motion for JMOL.

## II.  Remittitur on Compensatory Damages

Defendant Stomp argues that the Court should exercise its discretion to order remittitur on the ground that the evidence does not support the compensatory damages awarded.  [Doc. No. 100, p. 7]

The Court may order remittitur if the damages awarded are so excessive "as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial."  *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998) (internal quotation marks omitted).  Defendant bears "the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence."  *Id.* (internal quotation marks omitted).  "It is within the virtually exclusive purview of the jury to evaluate credibility and fix damages."  *United Int'l Holdings, Inc.*, 210 F.3d at 1230.  A court should not "second guess the jury." *Aerotech Res., Inc. v. Dodson Aviation, Inc.*, 91 Fed. Appx. 37, *43 (10th Cir. 2004) (unpublished).  The jury heard the evidence in the case, and had the

opportunity to weigh the credibility of witnesses and find the facts; the "determination of damages is traditionally a jury function." *Id.* The jury has wide latitude and discretion in determining that damages that will fairly compensate the injured party. *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985). "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 Fed Appx 63, 80-81 (10th Cir. 2007) (internal quotation omitted).

The Tenth Circuit has cautioned against comparison with other cases:  "First, such comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations.  Second, such comparisons detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1252 (10th Cir. 2000).  Assessment of compensatory damages in each case must be decided on the facts and circumstances of that case. *Id.*

Plaintiff, a Senior Engineer from the time he was hired in 2001 until the time of trial in 2012, testified at length about the positions for which he applied and about his claim that he was at least as qualified as many (though not all) of the candidates selected for the positions of Principal Engineer, Chief Engineer, Program Manager, and Environmental Compliance Manager. Plaintiff explained his theory of damages by alleging that he should have been selected for such positions, and would then have received a higher salary.  Plaintiff testified that at the time he was a Senior Engineer with a salary of $45,000, a Chief Engineer was paid about $50,000 more and a Principal Engineer was paid about $40,000 more.  [Doc. No. 93, p. 48; Doc. No. 102, p. 7] Plaintiff also testified that he did not pay close attention to advertised salaries (upon which Defendant's motion heavily relies) because Plaintiff understands that salaries "are very negotiable," so Plaintiff could have been paid more if he had been selected.  [Doc. No. 95, p.

141]  Plaintiff testified that at the time he received a salary adjustment, increasing his salary, the salaries for these positions also increased by a comparable amount.  [Doc. No. 93, pp. 48-49]  If Plaintiff had received the first promotion for which he applied, he could have received that increased salary from 2006 until the present.

In support of his argument that Plaintiff did not sufficiently prove his damages, Defendant quotes statements earlier in the case by Judge Eginton that he did not know how damages were to be charged.  [Doc. No. 100, p. 10]  But Judge Eginton also stated that he would later know how to charge damages, after hearing the closing arguments.  [Doc. No. 93, pp. 7-8, 27-33]

The Court notes that Defendant Stomp argues that the only relevant promotions are those for which Plaintiff was interviewed by Stomp.  [Doc. No. 100, p. 11]  Once again, Defendant takes too limited a view of damages.  As discussed above, the harm identified by Plaintiff was not just the failure to receive the particular promotions for which he applied; the harm from being marginalized, isolated, and stripped of responsibilities was that Plaintiff was relegated to a position from which he was unable to improve his qualifications and gain the supervisory and other experience necessary to enable him to successfully compete for promotion.  As Plaintiff argued in his opening statement, Chavez was prevented from advancing in his career:

> He was denied these promotions.  He was moved to a different part of the department.  He was isolated.  Certain responsibilities that were germane to his job and to his ability to advance were stripped of him so that he wouldn't have the opportunity to advance, so that he wouldn't have the opportunity to make a mark and to help as he wanted to, as he had chosen his profession.

[Doc. No. 95, pp. 8-9]  Plaintiff repeated this argument in closing:

> It wasn't just that Mr. Stomp didn't promote him when he came up for a job interview.  It's Mr. Stomp prevented him from getting better jobs by isolating him, by moving him.

[Doc. No. 93, p. 63]  Plaintiff argued that, because of Stomp's actions, Chavez had "no upward mobility."  [Doc. No. 93, p. 64]  Plaintiff argued that the promotions Chavez did not get "cost [him] money from 2006 until now," because Chavez was deprived of opportunities to keep on advancing to higher positions; Chavez was prevented from attaining higher positions and higher salaries in the future.  [Doc. No. 93, pp. 68-69]

Even under Defendant's view of what the evidence showed, Defendant concedes that the evidence could support a damage calculation as high as $120,000:  "In sum, the absolute highest damage calculation that can be made from the evidence presented by Plaintiff amounts to $120,000."  [Doc. No. 100, p. 14]  Defendant asserts that this is not a reasonable figure, however, because Chavez "all but admitted he was not entitled to receive" the position upon which this calculation relies, and his attorney in closing advocated for only a $15,000 to $20,000 annual loss of salary.  [Doc. No. 100, p. 14]

It is unnecessary, however, for the Court to further delve into the details of each possible promotion and salary, because Defendant's argument ignores two additional bases for the jury's compensatory damages award.  First, the jury was instructed that it could award compensation for future damages, including lost opportunities for advancement; this is a broader basis for compensation than loss of the particular promotions for which Plaintiff applied.  [Doc. No. 86, p. 5]  Second, the jury was instructed that it could award compensatory damages for emotional harm.  The jury was instructed that it could award compensation for emotional harm "during and after the events complained of, including emotional distress or pain, humiliation, embarrassment, fear, anxiety and/or anguish."  [Doc. No. 86, p. 6]  Defendant Stomp did not argue during trial, and does not argue now, that there was any error in these instructions.  Even accepting Defendant's $120,000 figure, the jury could easily reach the $180,000 award by adding some

future loss of income caused by Plaintiff's lowered professional status and development and adding some emotional damages.

Although loss of earnings requires specific proof, general damages for pain and suffering are not susceptible to proof by a set dollar amount. *See Blanke*, 152 F.3d at 1237. The jury therefore has "wide discretion" in rendering a particular amount for pain and suffering. *Woolard v. JLG Indus., Inc.*, 210 F.3d 1158, 1174 (10th Cir. 2000). Indeed, the Tenth Circuit affirmed damages of $1.5 million even though this amount exceeded the amount sought by the plaintiff. *Id.* at 1173-74.

As related in the preceding section, Plaintiff and Kennedy testified that Plaintiff suffered emotional harm. Plaintiff's own testimony, together with the circumstances of the case, was sufficient to sustain Plaintiff's burden of proof. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997) (holding, in failure-to-promote case, that medical or expert testimony was not required in addition to plaintiff's own testimony regarding emotional distress, and affirming award of $100,000 for mental anguish and loss of enjoyment of life caused by failure to promote); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546 (8th Cir. 2013) (holding, in retaliation case under Title VII, that evidence was sufficient to instruct on damages for emotional distress based solely on testimony from plaintiff employees). Plaintiff argued that he was hurt from continually being denied promotions, and that the jury could compensate him for that emotional harm. [Doc. No. 93, p. 69]

After receiving the verdict, Judge Eginton said that the verdict was "a tribute to [Plaintiff's] summation." [Doc. No. 94, p. 13] Judge Eginton said that he himself had believed throughout the case that there would probably be a defense verdict, but that Plaintiff's summation

had him thinking that might not happen.  The Judge's statements suggest that he did not consider the award so excessive as to shock his conscience.

The jury had the opportunity to observe the parties in court and to hear all of the evidence; it was the jury's province, as trier of fact, to determine the amount of damages that would fairly compensate Plaintiff.  *See Blanke*, 152 F.3d at 1236.  Given the evidence, the Court concludes that the damages awarded are reasonable and certainly not excessive so "as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial."  *Blanke*, 152 F.3d at 1236 (internal quotation marks omitted).  Defendant has not carried his "heavy burden" of demonstrating that the jury's award should not be honored.

The Court concludes that remittitur is not appropriate.

## III. Inconsistent Verdicts

Defendant argues that the Court should set aside the entire compensatory damage award under Count III because it is inconsistent with the jury's verdict on Count II.  Defendant argues that once the jury found for Defendants on Count II, the jury could not consistently find for Plaintiff on Count III.  [Doc. No. 100, pp. 15-16]

The jury instructions, however, allowed the jury to find for Defendants under Count II and for Plaintiff under Count III.  The "Special Verdict Form" stated that, even if the jury answered "No" to Question 3, the jury should proceed to Question 5:

**Title VII:  Religion**

3.  Did plaintiff prove, by a preponderance of the evidence, that he was not selected for a promotion due to his religious beliefs in violation of Title VII?

Yes _____          No _____

**If you answered Yes to the above question, please proceed to the next question.  If you answered No, please proceed to question 5.**

. . . .

**42 U.S.C. § 1983:  Retaliation**

5.  Did plaintiff prove, by a preponderance of the evidence, that defendant Stomp retaliated against him for exercise of his First Amendment rights by preventing his promotion?

Yes _____          No _____

[Doc. No. 90, pp. 1-2]  The jury was instructed that if it found for Plaintiff on any one of the three counts, the jury should state the amount of compensatory (or nominal) damages Plaintiff should be awarded.  [Doc. No. 90, p. 2 (Question #7)]  Thus the verdict form allowed the jury to award damages even if it found for Plaintiff only on Count III—as it did.

Defendant Stomp now essentially argues that if the jury answered "No" on Question 3, the jury should have been instructed to skip Questions 5 and 6.  Defendants, however, did not preserve an objection to this structuring of the Special Verdict Form.  *See Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1172 (10th Cir. 2003) (holding that party must both proffer an instruction and make a timely objection to preserve claim of error; proffer of jury instruction differing from instruction given does not by itself preserve challenge to jury instruction).

In a case cited with approval by the Tenth Circuit, the First Circuit determined under similar circumstances that the defendant should have raised the argument of inconsistent verdicts by objecting to the form of the instructions.  *Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 62-63 (1st Cir. 2002) (auto accident alleging faulty seat belt); *see Johnson v. ABLT Trucking Co.*, 412 F.3d 1138, 1143 (10th Cir. 2005) (citing *Babcock* with approval on a related issue).  The *Babcock* court stated that the jury instructions made it clear that the jury could return a verdict in

the plaintiff's favor if the jury found either negligence or a design defect; the court therefore held that the defendant had forfeited objection on the ground that the verdicts were inconsistent when the jury found for the defendant on negligence and for the plaintiff on product liability (strict liability). *Babcock*, 299 F.3d at 62-63. In another case cited with approval by the Tenth Circuit on this point, the Seventh Circuit held that the defendants' argument that the verdicts were inconsistent was an indirect attack on the damages instructions given, which authorized the verdict; the Seventh Circuit held that the defendants waived that argument by failing to make a specific objection to the jury instructions given. *Bogan v. Stroud*, 958 F.2d 180, 182-84 (7th Cir. 1992); *see Farm Bureau Life Ins. Co.*, 408 Fed. Appx 162, 172 (10th Cir. 2011) (unpublished). The instructions in *Bogan* allowed the jury to award punitive damages although it awarded zero compensatory damages. Defendant Stomp failed to preserve his claim of inconsistent verdicts, because he failed to object that the Special Verdict Form was in error by allowing the jury to find for Defendants on Count II and for Plaintiff on Count III. As in *Bogan*, the jury followed the instructions given, which allowed the allegedly inconsistent verdicts.

In addition, Defendants failed to object to the allegedly inconsistent verdicts before the jury was discharged. The Tenth Circuit holds that "a party waives the right to object to inconsistencies in a general verdict with special interrogatories if it does not object on that ground before the jury is discharged 'unless the verdict is inconsistent on its face such that the entry of judgment upon the verdict is plain error.'" *Johnson*, 412 F.3d at 1141 (quoting *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1545 (10th Cir. 1993)). In contrast, if the jury returns a special verdict, objection to inconsistencies before the jury is discharged is not required to preserve the issue. *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 851 (10th Cir. 2000).

Defendant Stomp did not raise any objection on the ground of inconsistencies in the verdicts before the jury was discharged.  Whether Defendant's failure to object constitutes a waiver therefore depends on whether there was a special verdict or a general verdict with special interrogatories.  "[T]he hallmark of a general verdict is that it requires the jury to announce the 'ultimate legal result of each claim.'"  *Johnson*, 412 F.3d at 1143 (quoting *Zhang v. Am. Gem Seafoods, Inc*., 339 F.3d 1020, 1031 (9th Cir. 2003)); *see Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 944-45 (10th Cir. 1994) (holding jury plainly issued a general verdict when form asked whether plaintiffs should recover, and that subsequent questions about bad faith and violation of specific policy questions were special interrogatories; observing that jury established that plaintiffs should recover on their contract claim).  "Simply put, a general verdict permits the jury to decide who wins."  *Johnson*, 412 F.3d at 1142 (internal quotation marks omitted).  For example, in *Thompson* the Tenth Circuit held that the verdict was plainly a general verdict when the first part asked the jury whether the plaintiffs should recover on their contract claim. *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 944-45 (10th Cir. 1994).  The *Thompson* verdict was not a special verdict although the second, third, and fourth parts of the verdict asked the jury whether the plaintiffs had proved their claim of bad faith, whether the plaintiffs had violated a specific provision of their insurance policy, and what the damages were; these three questions constituted special interrogatories.  *Id.* at 944-46.  Since the verdict in *Thompson* required the jury to decide the ultimate legal result, it was a general verdict.  *See Johnson*, 412 F.3d at 1143.

In contrast, a special verdict presents the jury with specific questions of fact; after the jury makes findings of fact, the court applies the law to those facts and enters judgment accordingly.  In *Johnson*, the Tenth Circuit held that the verdict was a special verdict when it

required the jury to answer specific questions about fault and damages relating to a traffic accident. The judge applied the law to those facts; the judge was required to apply state law on comparative negligence before the jury's allocation of fault (10% and 90%) could be translated into a judgment. *Johnson*, 412 F.3d at 1142-43.

The title of the verdict form is not controlling. The *Johnson* court cited a First Circuit case to illustrate this proposition. In *Babcock*, the verdict form asked the jury to determine whether the plaintiff had proved her negligence claim by a preponderance of the evidence, and whether she had proved her products liability claim by a preponderance; the jury found for the plaintiff on negligence and for the defendant GM on the strict liability count. *Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 62-63 (1st Cir. 2002). Although the verdict form in *Babcock* was entitled "Special Verdict Form," the verdict was a general verdict with special interrogatories designed to focus the jury's deliberations on the crucial issues. The jury did not merely make findings of fact, but also entered conclusions of law and determined which party prevailed on each count. *Id.*; *see Johnson*, 412 F.3d at 1143. Alternatively, there were two general verdicts in *Babcock*, one on each claim. *Babcock*, 299 F.3d at 63 n.1. Either way the verdict is viewed, the same requirement of preservation applies. *Id.* Thus the *Babcock* court held that GM had forfeited its objection to alleged inconsistency between the verdicts by failing to object at a time when the trial court could have taken corrective action. *Id.* at 63-66 ("To decide otherwise would countenance agreeable acquiescence to perceivable error as a weapon of appellate advocacy." (internal quotation marks omitted)).

In the case before this Court, the verdict was a general verdict on the three claims (or, alternatively, as in *Babcock*, there were three general verdicts). The jury did not merely make findings of fact, but also entered conclusions of law and decided the ultimate legal result. The

jury determined that Defendants prevailed on Counts I and II, and that Plaintiff prevailed on Count III; the jury also set damages on Count III.  There was no application of law left for Judge Eginton.  Although the form was entitled "Special Verdict Form," this title is not determinative.  *See Johnson*, 412 F.3d at 1143; *Babcock*, 299 F.3d at 63.

Since the verdict was a general verdict, Defendant waived the right to object to inconsistencies because Defendants did not object on that ground before the jury was discharged.  *See Johnson*, 412 F.3d at 1141.  The only issue before the Court, therefore, is whether "the verdict is inconsistent on its face such that the entry of judgment upon the verdict is plain error."  *Johnson*, 412 F.3d at 1141 (internal quotation marks omitted).  Defendant bears the burden of demonstrating that there were inconsistent verdicts because of jury confusion or abuse.  *Aerotech Res., Inc. v. Dodson Aviation, Inc.*, 91 Fed. Appx. 37, 41 (10th Cir. 2004) (unpublished).

The plain error standard requires a showing that substantial rights were affected.  This standard "is limited to errors that seriously affect the fairness, integrity or public reputation of judicial proceedings."  *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1181 (10th Cir. 2005) (internal quotation marks omitted).  "'Plain error review presents an extraordinary, nearly insurmountable burden.'"  *Id.* (quoting *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 802 (10th Cir. 2001)).  "[A] party must demonstrate (1) an error, (2) that is plain or obvious under existing law, and (3) that affects substantial rights."  *Id.*

"'A verdict that resolves separate and distinct causes of action in favor of both parties is not inconsistent on its face."  *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1547 (10th Cir. 1993) (quoting *Harris Mkt. Research v. Marshall Mktg. & Communications, Inc.*, 948 F.2d 1518, 1522 (10th Cir. 1991)).  In contrast, when two causes of action are identical and are defended on the same ground, a verdict for the plaintiff on one cause and for the defendant on the other is

inconsistent on its face. *Oja v. Howmedica, Inc.*, 111 F.3d 782, 790-91 (10th Cir. 1997). In *Stone*, the Tenth Circuit held that a § 12(2) claim under the Securities Act and three RICO claims were separate and distinct causes of action so that the finding of liability under the RICO counts was not inconsistent with the finding of no liability under the § 12(2) count. *Id.* Because there was no facial inconsistency, the objection to alleged inconsistency was waived when no objection was raised before the jury was discharged. *Id.* If a rational jury could have reached the verdict, there is no plain error. *See Thompson*, 34 F.3d at 945.

The Court concludes that a rational jury could have determined that Plaintiff had not proved that he was not selected for the promotions for which he applied because of racial or religious discrimination, and also determined that Plaintiff had proved that Defendant Stomp retaliated against Plaintiff by preventing his promotion in general—marginalizing Plaintiff and taking away responsibilities so that Plaintiff was not able to attain the experience and status that would have improved his professional qualifications. There are two critical differences involved. Counts I and II required the jury to find that the Water Authority (together with Stomp in his official capacity) was at fault; on the other hand, Count II asked the jury whether Stomp—in his individual capacity—was at fault. Counts I and II asked the jury whether there was discrimination when Plaintiff "was <u>not selected for a promotion</u>." [Doc. No. 90, p. 1 (emphasis added)] On the other hand, under Count III, the jury found that Stomp—in his individual capacity—was at fault for "<u>preventing his promotion</u>." [Doc. No. 90, p. 2 (emphasis added)] The ordinary meaning of "preventing his promotion" is broader than the language of Counts I and II, and encompasses more conduct than just failing to select Plaintiff for the particular jobs for which he applied. The evidence allowed a rational jury to find that the employer, the Water Authority, did not discriminate against Plaintiff by not selecting him for those jobs, while the

individual, John Stomp, marginalized and isolated Plaintiff.  On these instructions, the jury could reasonably find that this marginalization and isolation prevented Plaintiff's promotion by relegating Plaintiff to a position from which he was unable to successfully compete; the jury could find that Stomp impeded Plaintiff's professional development and limited his professional experience.  *See Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1275 (10th Cir. 2005) (stating that court must consider jury instructions given when deciding whether verdicts are inconsistent).  The jury could also have found that Stomp's retaliation caused emotional harm, and awarded damages solely—or in part—on that basis.   Because of these two critical differences—the actor and the breadth of conduct covered—the Court concludes that a rational jury could reach these results on Counts I, II, and III.  The Court concludes that Count II and Count III constituted sufficiently separate and distinct causes of action, so that there was no facial inconsistency.  *See Stone*, 998 F.2d at 1547.  There was no plain error.

Even if Defendant had properly raised the issue of inconsistent verdicts, the Court would conclude that these verdicts are not inconsistent.  When reviewing a claim of inconsistent verdicts, the court "'must accept any reasonable view of the case that makes the jury's answers consistent.'"  *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 852 (10th Cir. 2000) (quoting *Patton v. TIC United Corp.*, 77 F.3d 1235, 1241 (10th Cir. 1996)).   "If there is any plausible theory that supports the verdict, the reviewing court must affirm the judgment."  *Johnson*, 412 F.3d at 1144.   "In order to protect the jury's function, the courts must 'reconcile the jury's findings, by exegesis if necessary, . . . before [they] are free to disregard the jury's special verdict and remand the case for a new trial.'"  *Johnson*, 412 F.3d at 1143 (quoting *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 119 (1963)).  "To be irreconcilably inconsistent, the jury's answers

must be 'logically incompatible, thereby indicating that the jury was confused or abused its power.'"  *Id.* (quoting *Stone v. Chicago*, 738 F.2d 896, 899 (7th Cir. 1984)).

Defendant argues that the "only reasonable explanation" of the jury's verdicts is that the jury found a First Amendment violation but did not find that violation prevented Plaintiff's promotion.  [Doc. No. 100, p. 16]  Defendant further contends that Plaintiff limited himself to nominal damages under this theory and presented no evidence of damages apart from the failure to promote.  [Doc. No. 100, pp. 16-17]  The Court disagrees.  Defendant once again ignores the evidence allowing damages for emotional harm and future damages.  Plaintiff did present evidence of emotional harm, as discussed above, and also presented evidence that his status in his career had been reduced so that he was deprived of the opportunity to advance in the future. Defendant's argument again incorrectly assumes that the retaliatory conduct is no broader than the failure to select Plaintiff for the jobs for which he applied.  In addition, the Court does not believe that Plaintiff's closing argument limited him to nominal damages under Count III; after saying he could just stop with a request for $1 in nominal damages, Plaintiff stated that he "won't stop there" because things went further.  [Doc. No. 93, pp. 56-67]

Defendant also asserts that it was only after the close of evidence that Plaintiff suggested that the failure to promote was not the only harm, and that Plaintiff presented a "surprise theory of a possible constitutional violation separate from a failure to promote."  [Doc. No. 100, p. 16] To the extent that Defendant attempts to limit Plaintiff's case, the Court disagrees with this characterization.  Plaintiff's opening statement argued that, in addition to being denied promotions, Plaintiff was marginalized and isolated, and was stripped of responsibilities that were important to his ability to advance; Plaintiff argued that the latter actions deprived Plaintiff of the opportunity to improve his professional qualifications and to advance in his career.  [Doc.

No. 95, p. 8]  Plaintiff argued that the adverse actions included both the failure to promote and the marginalization.  [Doc. No. 95, p. 9]

The Court concludes that the verdicts are not inconsistent; there is a fortiori no plain error.

## IV.  After-Acquired Evidence Doctrine

Defendant argues that remittitur is required to address Plaintiff's misrepresentations on his applications, under a novel extension of the "after-acquired evidence doctrine."  [Doc. No. 100, pp. 17-22]  Defendant contends that Plaintiff did not have the minimum supervisory experience required for the jobs for which he applied and that in the interests of equity Plaintiff should not benefit from misrepresentations.

Defendant correctly states that Plaintiff admitted to changing his work history around—adding years to his work at Nevada Power and omitting other employments, which had the effect of adding years to Plaintiff's supervisory experience since it was at Nevada Power that Plaintiff acted as a supervisor.  [Doc. 95, p. 208-30]  Plaintiff testified that he "customized" his resume in order to "optimize the history."  [Doc. 95, pp. 215-18]  Plaintiff said:  "I did attempt to tailor my resume in accordance with the job requirements hoping to improve my chances as a candidate." [Doc. No. 95-1, p. 36]  The alterations in Plaintiff's work history had the effect of increasing his supervisory experience from two years at Nevada Power to five years, although Plaintiff also testified that he had some additional supervisory experience that he had not previously identified on resumes and applications.  Plaintiff testified that he considered he was informally supervising interns at Chino Basin—although he had not reported that as supervisory experience on earlier applications.  [Doc. No. 95, pp. 222-31]

The positions for which Plaintiff applied required a minimum of four or five years of supervisory experience.  [Doc. No. 95-1, pp. 231-232]  Defendant Stomp contends that Plaintiff

misrepresented his supervisory experience, that he would not have met the minimum requirements of the jobs for which he applied, and that this misrepresentation warrants remittitur and reduction of compensatory damages to some figure between $8,862 and $44,267—or, alternatively, that the court should enter an award of nominal damages and let stand the jury's award of $100,000 in punitive damages.  [Doc. No. 100, pp. 21, 15]

Defendant relies on two cases for the proposition that an employee should not be heard to complain about being wrongfully discharged "because the individual is no worse off than he or she would have been had the truth of his or her misconduct" been known by the employer before the discharge.  *Crawford Rehab. Servs. v. Weissman*, 938 P.2d 540, 547 (Colo. 1997) (en banc).

In *McKennon*, the Supreme Court addressed the question of whether an employee discharged in violation of the Age Discrimination in Employment Act of 1967 is barred from relief when the employer discovers after her discharge evidence of wrongdoing that would have led to her discharge on lawful and legitimate grounds.  *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995).  The sixty-two-year-old plaintiff, who had worked for the Banner for thirty years, was discharged allegedly as part of a workforce reduction plan.  *Id.* at 354.  She sought a variety of legal and equitable remedies under the ADEA, including backpay.  *Id.*  While preparing for trial, the Banner discovered that McKennon had copied confidential documents on the company's financial condition.  *Id.* at 355.  The lower courts held that the employee is barred from all recovery when the employer proves that the employee would have been fired at any event on the basis of the after-acquired evidence.  *Id.* at 355, 359.  Since the statute provided for legal or equitable relief, the Supreme Court held that the employee's wrongdoing was relevant but did not bar recovery of backpay—although concluding that reinstatement and front pay were

not appropriate remedies.  *Id.* at 361-62.  There is a critical limitation in *McKennon*, however, making the case inapplicable when the employee has not been discharged:

> Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.

*Id.* at 362-63.  In *Weissman*, the Colorado Supreme Court suggested that the after-acquired evidence doctrine may give the employer a defense if the employer can show that it would not have hired the employee if it had known of resume fraud.  *Weissman*, 938 P.2d at 547.

As Defendant Stomp recognizes, the after-acquired evidence doctrine "does not lend itself well to the facts of this case, where Mr. Chavez is still employed by the Water Authority." [Doc. No. 100, p. 20]  Nor would *Weissman's* extension to resume fraud be apposite, because Plaintiff was not hired for the jobs for which he applied.  In addition, the *Weissman* court "hasten[ed] to add that not every misrepresentation" is sufficient to afford a defense to an employer; the after-acquired evidence doctrine can only provide a complete defense if the employer proves that the misrepresentation "undermined the very basis upon which he or she was hired." *Id.* at 549.

Although Defendant Stomp asserts that the Water Authority was not aware of any misrepresentations at the time Plaintiff was applying for the promotions, this is a factual issue that has not been found either by the jury or by Judge Eginton.  Indeed, at trial Defendants established the alterations in Plaintiff's work history on the basis of past applications and resumes presented to the Water Authority or its predecessor.  Other unestablished and critical factual issues include whether Plaintiff's other experience might have been sufficient to fulfill the stated minimum years of supervisory experience, and whether the Water Authority rigidly insists on that minimum supervisory experience and would never hire someone with less.  *Cf. Ricky v.*

*Mapco, Inc.*, 50 F.3d 874, 875-76 (10th Cir. 1995) (discussing factual nature of relevant issues); *Weissman*, 938 P.2d at 549 (setting out factual issues that must be proved). In *Ricky*, the Tenth Circuit emphasized that an employer must demonstrate that "the wrongdoing was 'of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.'" *Id.* at 876 n.3 (quoting *McKennon*, 513 U.S. at 362-63).

Plaintiff has not been discharged by the Water Authority, and was not in fact hired for the jobs which purportedly required greater supervisory experience; the cases on the after-acquired doctrine are inapposite. In addition, there are undeveloped and unresolved critical factual issues. The Court also observes that the jury was well aware of Plaintiff's alterations to his work history after Defendant's extensive cross-examination on this subject; the jury may well have taken that information into account in its deliberations. The Court concludes that Defendant Stomp's argument does not present a proper basis for this Court to order remittitur.

More important, a critical premise for Defendant Stomp's argument is that the damages awarded were solely based on the difference between Plaintiff's salary and the salary he would have received if he had been selected for the jobs for which he applied. Defendant argues that Plaintiff "is no worse off even if Mr. Stomp retaliated against him, because he was not qualified for the promotions forming the basis of his claims." [Doc. No. 100, p. 20] As discussed above, Defendant ignores the fact that the compensatory damages may have been awarded solely or partly for emotional harm, and solely or partly for impeding Plaintiff's professional development so that Plaintiff was deprived of future opportunities and the ability to advance. Remittitur of such damages under the after-acquired evidence doctrine would be entirely unwarranted. These

40

considerations present an additional basis for the Court's conclusion that remittitur is not justified by any extension of the after-acquired evidence doctrine.

## V.  Request for and Sufficiency of Punitive Damages

Defendant Stomp argues that the issue of punitive damages should not have been submitted to the jury because:  (A) Plaintiff did not explicitly request punitive damages in his Complaint or Amended Complaint; and (B) there was insufficient evidence to support the punitive damages award.  [Doc. No. 100, p. 22]

### (A)  Request for punitive damages

The Amended Complaint includes the following allegations and claims:

### FACTS COMMON TO ALL COUNTS

. . . .

12.  Defendant Stomp is the Plaintiff's superior in the Albuquerque Bernalillo County Water Utility Authority, and has been involved in the promotion process.

13.  Defendant Stomp is a devoutly religious Christian who often attempts to discuss his religious convictions with others in the workplace, including the Plaintiff, and has at times attempted to get the Plaintiff to attend his church, and on one occasion gave the Plaintiff a Bible.

. . . .

### COUNT III –DEPR[I]VATION OF RIGHTS UNDER COLOR OF STATE LAW  (42 U.S.C. § 1983)

. . . .

23.  Defendant Stomp, acting under color of law, has discriminated and retaliated against the Plaintiff because of his resistance to the attempts of the Defendant to impose his religious beliefs on the Plaintiff by using his position with the City to refuse him promotion to jobs receiving higher authority and wages where the Plaintiff was qualified to fill those jobs.

24. As a result of the actions of the Defendant, the Plaintiff has suffered religious discrimination and loss of wages and benefits.

WHEREFORE, the Plaintiff respectfully requests trial by jury as to this count and all counts in this Complaint that are triable to a jury, and requests that, after trial, the Court award damages as may be found by a jury in this matter for damages suffered as a result of the discriminatory and retaliatory actions of the Defendant as set forth above, and for the [deprivation] of the Plaintiff's rights and privileges as guaranteed by the Constitution of the United States.

[Doc. No. 14, pp. 3, 5-6]

The Amended Complaint does not contain an explicit request for punitive damages, nor does it contain allegations that Defendant Stomp acted maliciously, willfully, recklessly, or wantonly. However, the Court notes that the Pretrial Order, which was entered on October 14, 2011, identifies the affirmative relief sought by Plaintiff as "compensatory damages, *punitive damages*, attorney's fees and costs." [Doc. No. 42 at 2] [emphasis added]. And three months later, on January 12, 2012, Plaintiff submitted Requested Jury Instructions which contained the following specific request for punitive damages in the Verdict Form:

Question No. 5: If you anwered "Yes" to Question No. 3, do you find that the conduct of Defendant Stomp was malicious, willful, reckless, or wanton?

Yes _____          No _____

Question No. 6: If your answer to No. 5 is "Yes," state the total amount of punitive damages, if any, that you find needs to be awarded to punish Defendant Stomp and deter others from the commission of like offenses: _____.

[Doc. No. 48, p. 11 (filed 1/12/12)] The jury trial setting for January 23, 2012, was vacated; trial was eventually reset to begin on August 20, 2012, before Judge Eginton. [Docs. No. 51, 78-80, 85] The parties filed renewed jury instructions in August 2012. Plaintiff's renewed jury instructions again included the same questions quoted above, thus again requesting punitive damages. [Doc. No. 72, p. 11 (filed 3/3/12)] Defendants' proposed jury instructions did not request instruction on punitive damages, instead including a damages instruction stating that only

economic loss, including back pay and benefits, should be allowed.  [Doc. No. 69, p. 14 (filed 8/6/12)]

In August 22, 2012 discussions on jury instructions, Defendants observed that there was no request in the Amended Complaint for punitive damages.  [Doc. No. 93, p. 42]  Judge Eginton responded that Plaintiff "could have done a better job," but that "he's covered himself" by requesting in the Amended Complaint that "the Court award damages as may be found by a jury."  [Doc. No. 93, pp. 42-43]  Judge Eginton concluded that he might reconsider and would hear arguments on punitive damages if necessary before he entered judgment on the verdict:

> Judge Eginton:  So it could be better pleaded.  He's not entitled to what he claims [sic].  I don't have to read punitive damages into what he claims in Count One and Count Two, because he never referred to punitive damages.  He just talks about what damages the jury finds in this matter.  So I think that's probably enough to cover.
>
> I may reconsider that.  I don't think this jury is going to come in with punitive damages, based upon this case as I've heard it.  But if they do, I could take care of it because we have the special verdict.  And I'll hear arguments on punitive [sic] if it's necessary to hear them before I enter a judgment on the verdict.

[Doc. No. 93, p. 44]  Defendants did not, however, raise the issue again later.

Defendant asserts that "Plaintiff should have specifically requested punitive damages if he intended to seek them" and that "[h]aving chosen not to request punitive damages, Plaintiff was not entitled to have the jury consider the issue of punitive damages."  [Doc. No. 100, pp. 22-23]  Defendant apparently assumes that the Complaint was required to include an explicit request for punitive damages; however, Defendant cites no authority—from the Tenth Circuit or other jurisdictions—for this proposition.  This Court could decline to address conclusory arguments for which no authority is provided.  *See Cahill v. Am. Family Mut. Ins. Co.*, 610 F.3d 1235, 1238-39 (10th Cir. 2010); *Arizona Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1130 (10th Cir. 2009).

Federal Rule of Civil Procedure 8(a)(3) does require the complaint to include a demand for the relief sought:

> **(a) Claim for Relief.**  A pleading that state a claim for relief must contain:
>
> . . . .
>
> **(3)** a demand for the relief sought, which may include relief in the alternative or different types of relief.

There is, however, some tension between Rule 8(a)(3) and Rule 54.  Rule 54(c) provides that a party should be granted relief even if the party did not demand that relief in a pleading:

> **(c)  Demand for Judgment; Relief to Be Granted**.  A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

Fed. R. Civ. P. 54(c); *see Guillen v. Kuykendall*, 470 F.2d 745, 748 (5th Cir. 1972); *Scutieri v. Paige*, 808 F.2d 785, 792 (11th Cir. 1987); *cf. Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1298 (11th Cir. 1999) (suggesting that Rule 54(c) does not eviscerate Rule 8(a)(3)'s requirement that complaint include a demand for relief, but suggesting also that Rule 8(a)(3) may not require a request for all relief sought), *vacated in part on other grounds*, 204 F.3d 1069 (11th Cir. 2000).

Several cases from the Tenth Circuit shed some light on this issue.

In a case addressing whether a complaint satisfied the requirements of Rule 8, the Tenth Circuit focused primarily on whether the defendants were given fair notice of the plaintiff's claim. *Stanko v. Davis*, 297 Fed. Appx. 746, 748 (10th Cir. 2008) (unpublished).  In *Stanko*, the Tenth Circuit reversed the dismissal of a pro se complaint for failure to comply with Rule 8.  "'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Stanko*, 297 Fed. Appx. at 748 (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544 (2007) (internal quotation marks and ellipsis omitted)).  "Rule 8 requires also that pleadings "'be construed so as to do justice.'"  *Id.* (quoting Fed. R. Civ. P. 8(e)).  In holding that the complaint satisfied Rule 8 by giving the defendants fair notice, the Tenth Circuit also relied on the principle that pro se pleadings are held to less stringent standards.  *Id.*

In a case addressing whether a claim for damages was available although the complaint sought only injunctive relief, the Tenth Circuit reversed a grant of summary judgment for the defendant.  *Sanders v. Yeager*, 57 Fed. Appx. 381 (10th Cir. 2003) (unpublished).  In *Sanders*, the Tenth Circuit affirmed the district court's holding that the claim for injunctive relief was moot.  *Id.* at 382.  The plaintiff had never formally sought to amend the complaint to add a claim for damages, but in moving for summary judgment the plaintiff argued that he was entitled to summary judgment on the defendant's liability for damages; in addition, the plaintiff attached to his summary judgment motion a document stating that he sought "compensation damages" and punitive damages.  *Id.*   The Tenth Circuit held that the district court was on notice of the plaintiff's intention to seek damages, and the court should have allowed an opportunity to amend the complaint to seek damages even though the plaintiff had not made a formal motion to amend. *Id.* at 382.  Rule 15 allows amendment to the pleadings, during or after trial.  Fed. R. Civ. P. 15(b)(1).  The *Sanders* court observed that leave to amend must be freely given under Rule 15(a). *Id.* at 383.

In a case addressing the remedy for retaliation and wrongful termination, the Tenth Circuit affirmed the district court's award of front pay even though reinstatement and front pay had not been sought in the pleadings.  *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 956-57 (10th Cir. 1980).  The Tenth Circuit relied on Rule 54(c) in holding that the district court had

authority to award appropriate relief dictated by the evidence although that relief was not demanded in the complaint. *Id.* at 957.

In a 1966 case in which the defendant complained that the award of damages exceeded the amount requested in the pleading, the Tenth Circuit held that the district court was correct to grant the damages awarded. *Southwestern Inv. Co. v. Cactus Motor Co.*, 355 F.2d 674, 678 (10th Cir. 1966). The Tenth Circuit relied on Rule 54(c)'s provision that the judgment should grant the relief to which the plaintiff is entitled despite failure to demand that relief in the pleadings. *Id.*; *see Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 352 (2008) (5-4 decision) (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) (observing that demand for one form of relief does not preclude another remedy not demanded in pleadings, under Rule 54(c)); *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953, 967 (D.C. 2008) (observing that federal courts have consistently viewed Rule 54(c) "as diminishing or eliminating the significance of the prayer for relief"). The Tenth Circuit also relied on Rule 15(b)'s provision allowing amendment to the pleadings—and stated that it did not matter whether the complaint was in fact amended. *Cactus Motor Co.*, 355 F.2d at 678; *see also United States ex rel. Bachman & Keffer Constr. Co. v. H.G. Cozad Constr. Co.*, 324 F.2d 617, 619-20 (10th Cir. 1963) (holding that award of judgment in amount greater than requested in pleading was proper under Rule 15(b)). The Seventh Circuit cited *Cactus Motor Co.* in holding that the district court properly granted a late request for injunctive relief, which was not requested in the complaint, and even though the plaintiff never amended her complaint to request an injunction; the Seventh Circuit relied on the principle that Rule 54(c) is liberally construed, "leaving no question that it is the court's duty to grant whatever relief is appropriate in the case." *Kaszuk v. Bakery & Confectionery Union*, 791 F.2d 548, 559-60 (7th Cir. 1986).

The Court is aware of caselaw from other circuits also indicating that the complaint need not explicitly request punitive damages.  In a somewhat different context, the Seventh Circuit held that punitive damages are possible even when the complaint neither explicitly requests punitive damages nor alleges wanton or egregious conduct; this conclusion justified the exercise of diversity jurisdiction because of the amount of a possible recovery.  *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 831 (7th Cir. 2011).  The Seventh Circuit observed that "juries can award damages not requested by the complaint," and also that amendments to the complaint may be allowed.  *Id.*

In holding that the failure to demand punitive damages in the complaint did not preclude the award, the Eighth Circuit relied on the Rules' approval of notice pleading.  *Bowles v. Osmose Utils. Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006).  The Eighth Circuit stated that although neither the original nor the amended complaint requested punitive damages, the defendant was put on notice three weeks before trial of the plaintiff's intention to seek punitive damages by the plaintiff's pre-trial disclosure material (and possibly was put on notice three months before trial, by the plaintiff's request for the defendant's net worth, which would make sense only if the plaintiff sought punitive damages).  *Id.*  The complaint "might have been more artfully drawn," but the important point was that the defendant had adequate time to prepare his defense.  *Id.*  The Eighth Circuit also relied on Rule 54(c), which provides that a party shall be granted the relief to which it is entitled even if that relief was not demanded in the party's pleadings.  *Id.*  Even if punitive damages were "special damages," which Rule 9(g) requires to be "specifically state," the *Bowles* court held that the purpose of this rule, too, is to guard against unfair surprise and that object was satisfied by the notice three weeks before trial.  *Id.*

In holding that the trial court committed reversible error in refusing to instruct on punitive damages, the Eleventh Circuit held that "a specific prayer for punitive damages was unnecessary," when the complaint alleged conduct supporting a claim for punitive damages and evidence was presented creating a jury question on such relief. *Scutieri v. Paige*, 808 F.2d 785, 792 (11th Cir. 1987) (holding that trial court committed reversible error in refusing to instruct jury on punitive damages). In *Scutieri*, the complaint specifically asserted that the defendants acted "intentionally and maliciously, wantonly, willfully, in bad faith, with gross and reckless disregard," and also alleged that the defendants' conduct was "so flagrant and wanton as to justify an award of punitive damages." *Id.* at 792-93.

The Fifth Circuit similarly held that a trial court erred in not instructing the jury on punitive damages when the plaintiff's pleading asked for $50,000 in damages without asking for exemplary damages. *Guillen v. Kuykendall*, 470 F.2d 745, 747-48 (5th Cir. 1972). The complaint in *Guillen*, however, did specifically allege "malice and unwarranted excessive actions." *Id.*

The Tenth Circuit suggested it agreed with *Scutieri* and *Guillen* that Rule 54(c) may require instructing the jury on a remedy to which the plaintiff is entitled in light of the evidence presented at trial, even when the plaintiff limited his complaint to other forms of relief. *Simek v. J.P. King Auction Co.*, 160 Fed. Appx. 675, 683-84 (10th Cir. 2005) (unpublished). In *Simek*, the plaintiff had not requested the new remedy (forfeiture) until after trial, in a motion for a new trial on the claim for breach of fiduciary duty. *Id.* at 683. The Tenth Circuit held that the principle of *Scutieri* was inapplicable, however, because the plaintiff in *Simek* had not cited conclusive authority that forfeiture was an available remedy for breach of fiduciary duty. *Id.* at

684.  In addition, the Tenth Circuit held, Rule 54(c) does not allow post-trial imposition of a new remedy when the defendant would be unfairly prejudiced.  *Id.* at 684 n.5.

Rule 8 does not require technical pleading, but sets a liberal standard.  *Smith v. United States*, 561 F.3d 1090, 1104 (10th Cir. 2009).  Rule 15(b)(1) provides that during—or even after trial—if "a party objects that evidence is not within the issues raised in the pleadings," the court "should freely permit an amendment when . . . the objecting party fails to satisfy the court that the evidence would prejudice that party's . . . defense on the merits."  Rule 54(c) provides that the "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."   The Court concludes that Rule 8's requirement of a demand for relief is subordinated to Rule 54(c)'s provision that the court has a duty to grant the relief to which a party is entitled—regardless of whether that relief was demanded in the complaint.  "The trial court has the authority to award appropriate relief dictated by the evidence, even though it may not have been sought in the pleadings."  *Fitzgerald*, 624 F.2d at 957; *see* 10 Charles Alan Wright et al., *Federal Practice & Procedure* § 2664 (3d ed. 1998) (stating that Rule 8(a)(3) requirement is subordinated to Rule 54(c) requirement that court has duty to grant relief to which party is entitled regardless of whether it was demanded in pleading, unless opponent is prejudiced).

The Court concludes that the requirements of these Rules can be reconciled by consideration of the most important principles—whether Defendant was given fair notice that Plaintiff was seeking punitive damages and whether Defendant demonstrated any prejudice.  The policy of the Rules is that pleading technicalities do not control what relief is ultimately awarded. 10 Wright et al., *Federal Practice & Procedure* § 2664.  Fair notice was provided by the Court's

October 11, 2011 Pretrial Order – which merged the parties' pleadings and "control[led] the course of trial" -- more than ten months before trial began.  [Doc. No. 42, p. 18 (filed 10/14/11)].

In objecting to the inclusion of punitive damages in the instructions and special verdict, Defendants merely observed that the Amended Complaint did not specifically request punitive damages.  [Doc. No. 93, p. 42]   When Judge Eginton ruled that the Amended Complaint adequately stated a request, Defendants provided no further argument.  Although Judge Eginton stated that he would be willing to reconsider before he entered judgment on the verdict, Defendants did not again raise the issue and request reconsideration before judgment was entered on the verdict.  In discussion of the jury instructions with Judge Eginton, and now in the post-verdict JMOL motion, Defendant did not and does not claim lack of notice that Plaintiff would request punitive damages, nor has Defendant shown that he was prejudiced by the lack of a specific request for punitive damages in the Amended Complaint.  Instead, Defendant raises merely a technical argument.

The Court finds that Defendant had fair notice, ten months before trial, that Plaintiff would seek punitive damages.  The Court observes that there was and is no showing of prejudice. The Court further takes into consideration the liberal pleading standards of the Rules, the liberal allowance of amendments to pleadings, and the important principles of doing substantial justice and honoring a jury verdict.  Considering all of these principles, the Court concludes that Defendant's technical argument does not justify disallowance of the jury's award of punitive damages.

**(B)  Sufficiency of evidence on punitive damages**

Defendant Stomp also argues that there was insufficient evidence that he acted with a culpable mental state allowing punitive damages.  But Defendant failed to raise this argument

before submission of the case to the jury. *See Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1076 n.3 (10th Cir. 2002) (indicating that challenge to sufficiency of evidence on punitives is not allowed under Rule 50(b) unless raised in Rule 50(a) motion).[2]  As discussed in Section (I)(A) above, Defendants were required by Rule 50 to state in their pre-verdict JMOL motion the same grounds as in their post-verdict JMOL motion. *See United Int'l Holdings, Inc.*, 210 F.3d at 1228.  Defendants did not challenge the sufficiency of evidence on punitive damages in their pre-verdict motion for JMOL and did not argue that the issue of punitive damages should not have been submitted to the jury; Defendants therefore forfeited this argument.  For the Court to entertain Defendant's argument now would contravene the purpose of Rule 50—to give Plaintiff a chance to correct any deficiency in proof.  *See* Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment (stating that purpose of requirement for pre-verdict motion for JMOL "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked"); *Morrison Knudsen Corp.*, 175 F.3d at 1260 (observing that party can ask to reopen its case to provide additional evidence).  Defendant asserts that there was "not a triable issue of fact concerning punitive damages." [Doc. No. 100, p. 24]  This challenge to the sufficiency of evidence could, and should, have been made before submission of the punitive damages issue to the jury.

---

[2] The Tenth Circuit also stated, however, that the plaintiffs could not raise on appeal the argument that the defendants waived the sufficiency issue by failing to argue insufficiency in a Rule 50(a) motion, when the plaintiffs had not made that argument in opposing the Rule 50(b) motion.  *Guides, Ltd.*, 295 F.3d at 1076 n.3.  The Court again believes, however, that it is the Court's responsibility to enforce the dictates of the Rules in district court when the court is aware of a violation, and when that violation contravenes the primary purpose of the Rules; the Court reasons that it is particularly important under the circumstances of this case because an instructional error or deficiency of proof could have been cured before the case was submitted to the jury.

Because Defendant failed to properly raise the issue in a Rule 50(a) motion, the Court will review the evidence, but only under the lower standard of whether there is "any evidence" to support the jury's award of punitive damages.  *See United Int'l Holdings, Inc.*, 210 F.3d at 1229.

Defendant Stomp argues that there was insufficient evidence that he acted with an evil motive or with callous indifference to Plaintiff's rights.  [Doc. No. 100, p. 23] He argues that "viewing the evidence in the light most favorable to Mr. Chavez, the evidence could at most establish that Mr. Stomp gave Mr. Chavez a bible and invited him to church during what he understood to be a difficult time in Mr. Chavez's life; and that Mr. Stomp's conduct made Mr. Chavez uncomfortable."  [Doc. No. 100, p. 23]  "The evidence presented at trial falls far short of indicating, however, that Mr. Stomp intended to make Mr. Chavez feel uncomfortable or to violate his constitutional rights."  [Doc. No. 100, p. 23]

The Court first observes that Defendant is not applying the correct standards.  Plaintiff was not required to prove that Defendant Stomp "intended" to make Plaintiff uncomfortable or "intended" to violate Plaintiff's First Amendment rights.  A defendant's conduct does not have to be knowing or willful to support punitive damages in a § 1983 action.  *Hardeman*, 377 F.3d at 1120.  An "evil motive" is not required.  *Id.*  Punitive damages are available when the defendant's conduct is motivated by "evil motive or intent, *or* when it involves reckless or callous indifference to the federally protected rights of others.'"  *Id.* at 1120-21 (quoting *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003) (emphasis in original)).  Defendant also omits a particularly important part of the evidence:  testimony that Defendant Stomp twice blamed Plaintiff's difficulties on Plaintiff's failure to accept God into his life.

And Defendant fails to view the evidence in the light most favorable to the verdict. There is often no direct evidence of the defendant's state of mind, and often no direct evidence

tying retaliatory conduct to the plaintiff's protected conduct. *Hardeman*, 377 F.3d at 1115, 1120. The jury was entitled to reject Defendant Stomp's explanation for his actions and to infer that he was retaliating. *See id*. There was testimony that Defendant Stomp made more of a demand than a request that Plaintiff attend Defendant's church, and did so on several occasions. [Doc. No. 95, pp. 34-35; Doc. No. 95-1, pp. 5-6] Defendant Stomp admits giving Plaintiff a Bible, while at work. [Doc. No. 95, pp. 35-37] There was testimony that on two occasions Defendant admonished Plaintiff that it was Plaintiff's fault that he was suffering through a difficult divorce and allegations of sexual abuse of his daughters, saying "James, the reason you're having trouble is because you haven't accepted God into your life." [Doc. No. 95, p. 86; [Doc. No. 95-1, p. 7]

The Court concludes that a rational jury could find, from the character and number of these incidents, that Defendant Stomp acted with callous indifference to Plaintiff's First Amendment rights. *See Hardeman*, 377 F.3d at 1120-21. In fact, the jury was instructed on a higher standard than warranted—to Defendant Stomp's benefit; the verdict form required the jury to find that Defendant's conduct was "malicious, willful <u>and</u> reckless," while "reckless or callous indifference" would have been sufficient. [Doc. No. 90, p. 3 (emphasis added)] *See Hardeman*, 377 F.3d at 1120-21.

Defendant further argues that there is no evidence that Stomp considered Plaintiff's response when making promotion decisions. [Doc. No. 100, p. 24] As previously discussed, the Court concludes that there was evidence supporting a causal connection, and the jury could infer retaliation from the suspicious timing of Plaintiff's marginalization. *See Hardeman*, 377 F.3d at 1114-15 (concluding that circumstantial evidence, including "suspicious timing" of defendant's conduct, supported jury verdict that Mayor knew about plaintiff's protected speech and discharged her in retaliation).

Defendant also asserts that Plaintiff's retaliation claim "is founded solely on Mr. Stomp's presence on interview panels." [Doc. No. 100, p. 24]  As previously discussed, this assertion is inaccurate.  Plaintiff's claim was also based on acts of marginalizing and isolating Plaintiff, transferring him to Pino Yards, excluding him from important project discussions, and removing responsibilities from Plaintiff.  The Court has already concluded that there was sufficient evidence of a causal connection.

Given the standard of review, and the deference due to the jury's findings on conflicting evidence and to the jury's inferences, the Court would conclude that there was sufficient evidence to support the award of punitive damages.  Given Defendant's failure to raise the issue in a Rule 50(a) motion, however, the Court is only required to determine whether there was "any evidence" to support the punitive damages award.  The Court concludes that there was ample evidence to meet this lower standard.

## VI.  Remittitur on Punitive Damages

Defendant Stomp argues that the jury award of $100,000 in punitive damages was excessive and reflects passion or prejudice.  [Doc. No. 100, p. 25]  Defendant asks the Court to apply remittitur to reduce this award.

In contrast to the challenge to the sufficiency of evidence to support punitive damages, which the Court ruled had to be raised in a Rule 50(a) motion before the case was submitted to the jury, Defendant's challenge to the amount of the punitive damages actually awarded could not be made before submission of the case to the jury.  This challenge, therefore, did not need to be raised earlier in the case.

In ruling on a motion for remittitur, this Court may not substitute its opinion and evaluation of what constitutes egregious behavior for that of the jury.  *Klein*, 44 F.3d at 1504.

"There is no bright line between an acceptable and an unacceptable award of punitive damages." *Id.* "[T]he standard is one of reasonableness." *Id.* The question is "'whether the punitive damage award was so excessive that [it] shocks the judicial conscience or leads to the inescapable inference that it resulted from improper passion or prejudice on the part of the jury.'" *Id.* (quoting *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1177 (10th Cir. 1981)); *see Hardeman*, 377 F.3d at 1122. When there is a "mere possibility" that the punitive damage award was properly intended to punish the defendant's conduct and deter its repetition, the award should stand. *Hardeman*, 377 F.3d at 1123.

Although a high ratio of punitive to actual damages warrants close scrutiny, the Tenth Circuit "has never held that any ratio is per se excessive." *Klein*, 44 F.3d at 1504. The Tenth Circuit has held that a ratio of just over twenty-one to one was not, by itself, high enough to require reduction. *Hardeman*, 377 F.3d at 1123 (discussing *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1249 (10th Cir. 1999)). The ratio is merely one factor to be considered. *Klein*, 44 F.3d at 1504. Additional factors include the magnitude of harm to victims and the possible harm to other victims if similar future behavior is not deterred. *Id.* at 1505.

After trial, Judge Eginton stated that the verdict was "a tribute to [Plaintiff's] summation." [Doc. No. 94, p. 13] The Judge found it persuasive, stating that he had believed throughout the case that a verdict for the defense was probable but that Plaintiff's closing made him think that might not happen. [Doc. No. 94, p. 13] Regarding the retaliation claim, Judge Eginton said "obviously the jury regarded it as being a very important aspect of constitutional rights." [Doc. No. 94, p. 14]

The Court agrees with Judge Eginton's observation about the magnitude of harm and the importance of deterrence when an employee's religious freedom is violated by his supervisor's

55

conduct.  Because there was testimony to support Plaintiff's contentions and the jury received proper instructions, the Court finds no reason to believe that the jury was motivated by passion, prejudice, or any improper cause.  *See Klein*, 44 F.3d at 1504.  In accordance with the instructions and special interrogatories, the jury found that Defendant Stomp had retaliated, that his conduct was a proximate cause of Plaintiff's alleged damage, and that Stomp's conduct was "malicious, willful and reckless."  [Doc. 90, pp. 2-3]  And as previously noted, this standard was higher than required—to Defendant's benefit.  Defendant Stomp has not pointed to any evidence suggesting the award was motivated by passion, prejudice, or improper cause.  The Court concludes that a rational jury could award substantial punitive damages to deter future violations—particularly when the evidence included testimony that Stomp retaliated against another employee, Carol Kennedy, on similar grounds.  And the Court observes that the ratio of punitive damages to compensatory damages in this case is very low—$100,000 to $180,000.

The Court concludes that the punitive damages are not excessive, and do not shock the Court's conscience or raise an irresistible inference that the jury was motivated by passion, prejudice, or any improper cause.  The Court will deny the motion for remittitur of punitive damages.

## CONCLUSION

Defendant Stomp has not demonstrated that he is entitled to JMOL on any issue or that remittitur of compensatory or punitive damages is justified.  The Court will deny Defendant's motion.

**IT IS THEREFORE ORDERED** that Defendant's *Motion for Judgment as a Matter of Law, or in the Alternative To Alter or Amend Judgment* [Doc. No. 100] is **DENIED**.

**UNITED STATES DISTRICT JUDGE**